THE MOHEGAN. THE J. L. LUCKEN-BACH. THE LAKEWOOD.

Circuit Court of Appeals, Second Circuit. October 29, 1928.

Nos. 7–10.

Macklin, Brown, Lenahan & Speer, of New York City (Horace L. Cheyney, of New York City, of counsel), for appellant Central Railroad Co. of New Jersey.

Carter & Phillips, of New York City (Peter S. Carter, of New York City, of counsel), for appellee Luckenbach Steamship Co.

Haight, Smith, Griffin & Deming, of New York City (Henry M. Hewitt and W. Parker Sedgwick, both of New York City, of counsel), for appellee and appellant New England Steamship Co.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark and P. Fearson Shortridge, both of New York City, of counsel), for appellee Pennsylvania Railroad Co.

Foley & Martin, of New York City (James A. Martin and Edward E. Elder, both of New York City, of counsel), for appellee Olsen Water & Towing Company, Inc.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

SWAN, Circuit Judge (after stating the facts as above). The first collision was between the ferryboat Lakewood and the steamer Mohegan. The District Court found that it occurred about 150 feet off Pier 13, Manhattan shore, on the last of the flood tide. The Lakewood left Communipaw, N. J., at 7:04 a. m., bound for her New York slip on the north side of Pier 11. The fog was so dense that her lookout could not be seen from her pilot house. She proceeded cautiously, stopping, and going ahead on one bell, and blowing fog signals at proper intervals. The Mohegan was bound from Providence, R. I., for New York, her dock being the north side of Pier 14. As she proceeded down the East River, both shores were visible; not until she had rounded the Battery and was heading up the North River did she encounter a blanket of fog which shut out all visibility. She continued cautiously toward her dock, blowing fog signals, going ahead slowly, stopping, and sometimes backing to kill her headway. Her master testified that, when she was opposite Pier 13, she lay still a few minutes, because tows were whistling just ahead, and while so stopped the Lakewood "just touched us on our port quarter aft." Each vessel had heard the other's fog whistles. At the time of the collision the Lakewood had very little headway. When her lookout called to go back, the engines were put full speed astern, and at the same instant the vessels came together. The impact between them was very slight. The District Court found that both vessels were navigating with due care and that the collision was unavoidable.

The claimant of the Lakewood has appealed, and charges the Mohegan with fault (1) in not anchoring below Pier 11; and (2) in blocking the ferry slips. The fog did not shut down upon the Mohegan until she had reached Pier 1. Three possible courses of action were then open to her: To proceed cautiously to her own Pier 14, to anchor in the thoroughfare where she was, or to seek the anchorage at Bedloe's Island. No choice her master could have made would have been free from danger. He chose to proceed to his pier, on the theory that this was the shortest road to safety. We should not substitute our judgment for his, where we think there was a fair choice between possible courses. The Haven (C. C. A.) 277 F. 957, 959. Under the existing circumstances, we cannot say his decision was so clearly unwise as to be faulty navigation. In fact, the witness Erickson, called on behalf of the Pennsylvania Railroad Company, testified the risk of proceeding to Pier 14 would be less than that of anchoring between Piers 1 and 11. In a dense fog it is the duty of a steam vessel to anchor in a permissible anchorage as soon as circumstances will permit; but there is no absolute duty to anchor in a thoroughfare, for that will endanger herself and others as much as to continue with extreme caution. See La Bourgogne, 86 F. 475, 479 (C. C. A. 2); The Benjamin A. Van Brunt, 98 F. 131, 132 (C. C. A. 1); The City of Lowell (C. C. A.) 152 F. 593, 594; The Persian (C. C. A.) 181 F. 439, 447.

As to the second alleged fault: The rule against blocking ferry slips cannot be absolute when a vessel is approaching her own pier. To dock at Pier 14, the Mohegan was obliged to pass close to Pier 13, and the signals from tows ahead necessitated her stopping there for a short period. The decision that the first collision occurred without fault of the Mohegan is correct.

The second collision was between the Lakewood and the steamer J. L. Luckenbach. It occurred at 7:16 a. m., two or three minutes after the first collision above described, and at a point at least 1,350 feet from the Manhattan shore. The J. L. Luckenbach left Weehawken, N. J., at 6:16 a. m., bound for Boston. The fog at this time was not such as to require her to keep her pier. She proceeded down the river near the center of the stream, and when the dense fog was encountered checked her speed to the lowest possible rate consistent with retention of steerageway, and blew proper fog signals. She heard

the whistles which immediately preceded the collision between the Lakewood and the Mohegan. Her engines were stopped at 7:14. The port engine was then put slow ahead for half a minute to kick her bow to starboard. Both engines were full astern at the moment of collision with the Lakewood. Concededly the engines of the Lakewood were put full speed astern at the moment of her collision with the Mohegan. The testimony of her master is that the engines were kept in reverse only a few seconds. The District Court found, however, that she backed out into the river for a distance of about 1,200 feet and collided with the J. L. Luckenbach. The bow of the steamer went into the main deck and upper saloon of the ferryboat a little forward of amidship on the port side. The hull was not penetrated. The court also said: ·

"Evidently in the excitement which occurred as a result of the accident between the Lakewood and the Mohegan, the Lakewood paid no attention to the signals from the J. L. Luckenbach and failed to sound her fog signals."

· The navigation of the J. L. Luckenbach was found to be without fault, and the Lakewood was held solely responsible.

We can find no evidence to sustain the finding that the Lakewood failed to sound fog signals in the interval between her first and second collision. The testimony of her master that she did blow them is corroborated, not only by her own passengers, but also by witnesses from the Mohegan. Witnesses for the J. L. Luckenbach admit hearing whistles of the Lakewood, though there is some question whether they were referring to fog signals or backing signals. But whether she sounded fog signals or not is immaterial, in view of her fault in backing out so far and into the path of the oncoming steamer, whose signals she admits hearing. In spite of her denial that she did back so far, and the corroboration of her passengers, the established facts require a finding that she did back as the District Court stated. The location of the first collision is definitely established as being about 150 feet off Pier 13. The position of the second collision is also established beyond question by the location of the J. L. Luckenbach when the ·fog ·lifted, . for she backed away and anchored immediately after her collision with the Lakewood. The testimony is uncontradicted that she was riding at anchor about 1,400 feet out in the river opposite Pier 14. Whatever her witnesses say, the Lakewood must have backed away from the Mohegan at least 1,200 feet, for otherwise she could not have reached the path

of the J. L. Luckenbach. There was no occasion and no excuse for it. The J. L. Luckenbach was not bound. to drop anchor in the thoroughfare as soon as the fog shut in. We agree that she was navigated without fault, and that the Lakewood must be held solely to blame for this collision.

■ The third collision occurred between the ferryboat Washington and the steamer Mohegan. At 7:16 a. m. the Washington left her slip at Cortlandt street, New York, bound for Jersey City. She sounded a slip whistle, started her engines at full speed to clear the ferry rack, and then reduced her speed to slow. She passed the end of Pier 13 heading slightly down stream to compensate for the flood tide. She was making about one knot through the water and was sounding fog signals at regular intervals. Lookouts were stationed on her main deck, but the fog was so dense that it was impossible to see more than 20 feet ahead. According to the master's testimony, he heard the quickwater from a wheel and stopped his engines; then he felt a jar and learned that the Mohegan had backed into the Washington about 20 feet from the stern on the starboard side. The Mohegan was lying off the end of Pier 13, substantially where she was at the time of her first collision, which had occurred five or six minutes before. According to her master's testimony, she could not go ahead, because there were tows ahead of her. He denies that she at any time had sternway. The District Court found that, after her collision with the Lakewood, the Mohegan failed to sound fog signals and backed away from the scene of the accident, thereby causing a collision with the Washington.

We are unable to find evidence that the Mohegan failed to sound fog signals after her first collision. This is contrary to the testimony of her master and of witnesses on the Lakewood, who heard the Mohegan's fog signals after the first collision. It seems improbable that Capt. Barrett would have failed in this respect, particularly when he knew he was so close to the ferry slips. The testimony of the master of the Washington that he did not hear the Mohegan's signals is negative at the best, and does not overcome the positive testimony of the other witnesses. No doubt there was, as the witnesses· say, a medley of whistles all around, and hence the master of the Washington failed to identify the signals of the Mohegan or realize her exact location. The finding that the Mohegan's backing away from her first collision caused her to collide with the Washington is also not borne out by the record. The interval of

time between them was several minutes. The Mohegan had lain still off Pier 13 because of tows ahead. Her position there under the circumstances was not a fault. Consequently she was not shown to be responsible for this collision.

In the first three cases, the decrees are affirmed; in the last, the decree is reversed, and libel dismissed.