### THE T. J. HOOPER.
### THE NORTHERN NO. 30 and NO. 17.
### THE MONTROSE.
#### Petition of EASTERN TRANSP. CO.

### NEW ENGLAND COAL & COKE CO. v. NORTHERN BARGE CORPORATION.

### HARTWELL & SON, Inc., v. SAME.

District Court, S. D. New York.

Oct. 15, 1931.

2. Towage ⊙=15(2).

Foley & Martin, of New York City (James A. Martin and John R. Stewart,

both of New York City, of counsel), for Eastern Transp. Co.

Crowell & Rouse, of New York City (E. Curtis Rouse, of New York City, and John W. Oast, Jr., of Norfolk, Va., of counsel), for Northern Barge Corporation.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., and Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Charles S. Bolster, of Boston, Mass., of counsel), for H. N. Hartwell & Son and New England Coal & Coke Company.

COXE, District Judge.

These cases grow out of the foundering of the coal barges Northern 17 and Northern 30 in a storm off the New Jersey coast in March, 1928. Libels have been filed by the owners of the coal on the two barges for cargo loss against the barge owner. The owner of the tugs T. J. Hooper and Montrose has also instituted limitation proceedings, in which it seeks to be relieved from liability, and, at the same time, denies fault. In these limitation proceedings, the barge owner has answered, asserting negligent towage by the tugs, and claiming for the value of the barges. The cargo owners have also answered, alleging negligent towage, and contesting the right to limit. The cases have all been tried together as one action.

On March 7, 1928, the tug T. J. Hooper, with barges Carroll, A. H. Olwine, and Northern 30, and the tug Montrose, with barges Eastern, Joseph J. Hock, and Northern 17, left Hampton Roads, bound for New York and New England ports. The barges of the respective tugs were arranged in the order named, and all were heavily laden with coal. The T. J. Hooper and tow proceeded by the inside course, and the Montrose by the outside course, it being optional with each tug which course it would follow.

There were no storm warnings at Hampton Roads, or at any of the stations along the coast, until after both tows had proceeded some distance beyond Delaware breakwater; the only order for such warnings issued by the United States Weather Bureau being at Delaware breakwater at 9:30 a. m., March 9th. The two tows encountered good weather, and experienced no difficulties, until the Montrose, which was on the outside course, ran into a strong wind and a heavy sea at 10:20 a. m. on March 9th, and the Hooper, which was on the inside course, encountered similar conditions at 12 o'clock noon on the same day. The tows were then in the vicinity of Atlantic City, or about 50 miles north of Delaware breakwater.

Up to this point the tows had been making good progress, but, at the respective times stated, the tugs hauled head to the sea, and continued only with sufficient headway to keep the barges in line. At 4:45 p. m. on March 9th, the A. H. Olwine, which was the second barge in the Hooper tow, blew distress signals. The tug thereupon directed the tow to anchor, which was done on a single anchor without difficulty. The tug then proceeded back to the tow, and the Olwine reported that its steering gear was disabled. Otherwise, the Olwine and the Carroll were in no trouble. The Northern 30, however, reported that it was leaking, but that the "pumps could hold leak." At 8:25 p. m. on the same day, the weather having somewhat moderated, the Northern 30 reported that the leak was "gaining on pumps," and requested that the crew be taken off if distress signals were again displayed. At 6:50 a. m. on the following day, March 10th, the Northern 30 again blew distress signals and reported 10 feet of water in the hold, the tubes of the boiler gone, and the pumps out of commission. The crew, upon request, were thereupon taken off, and at 1:15 p. m. on March 10th, the Northern 30 sank.

The Montrose continued on her course, hauling head to the sea, until 4:30 p. m. on March 9th, at which time the Northern 17, the last barge in the tow, hoisted a distress signal, and the tug signaled the head barge to anchor and hold the tow. The tow thereupon anchored on a single anchor without difficulty, and, while the leading barge was holding the tow, the Northern 17 went to a separate anchorage. When the tug approached the Northern 17, the barge reported four feet of water forward and five feet aft, the smokestack to the boiler washed away, and the fires in the furnace out. At the request of the master, the crew were then taken off; and at about 2:30 a. m. on March 10th, or ten hours after the first distress signals, the Northern 17 sank.

It is the contention of the cargo owners (1) that the Northern 17 and the Northern 30 were unseaworthy when they left Hampton Roads; (2) that the two tugs, T. J. Hooper and Montrose, were negligent in not anticipating the storm which broke on March 9th, and in not taking refuge at Delaware breakwater; and (3) that the two tugs were unseaworthy in not having effective radio sets, capable of receiving the forecasts of unfavorable weather broadcast along the coast

on March 8th. The owner of the tugs insists, on the other hand, that the weather conditions and glass readings were not unfavorable until the tows had proceeded far beyond Delaware breakwater; and that, when the storm broke suddenly on March 9th, it would have accomplished nothing, and have been extremely hazardous, to have turned back to Delaware breakwater. It is denied, therefore, that the tugs were in any way at fault; and it is insisted that the loss of the barges was due to their own unseaworthy condition. The owner of the tugs insists, also, that neither tug was under a duty, statutory or otherwise, to carry a radio receiving set, and it is denied that weather reports of any kind were received by the tugs on March 8th. The owner of the two barges disputes that the barges were unseaworthy, and contends that the loss of the barges and their cargoes was due to the fault of the tugs.

The testimony with respect to the condition of the Northern 17 and Northern 30 came principally from the barge masters, and is not in serious dispute. The Northern 17 was loaded February 29, 1928, at Newport News, with 1,745 tons 300 pounds of soft coal, which, on the order of the transhipper, was sprinkled with 5,125 gallons of water while being loaded, causing it to become soggy and heavy, and increasing its weight by at least 20 tons.

After the barge had been loaded, Captain Fowler, the master, saw that it was overloaded, and protested to the representative of the owner, but no notice was taken of the protest. There is evidence, also, that captain Fowler, after being taken on board the tug, stated that the barge was "loaded too deep," and was lower in the water than it had ever been. The barge was ten years old, and not capable of carrying such a load as was placed on it at Newport News. The weight of the cargo was at least 1,765 tons, which was substantially in excess of the largest cargo carried during the ten trips next preceding. I have little difficulty, therefore, in finding that the Northern 17 was overloaded and unseaworthy. The Benjamin Noble (C. C. A.) 244 F. 95, 97; The G. B. Boren (D. C.) 132 F. 887. I think, also, that the absence of the deck plate over the ventilator hole, and the faulty construction of the forward bulkhead, were serious defects which contributed to the foundering. In the face of such a showing, the barge can hardly be said to have been "reasonably fit to carry the cargo which she [had] has undertaken to transport." The

Southwark, 191 U. S. 1, 9, 24 S. Ct. 1, 3, 48 L. Ed. 65.

With respect to the Northern 30, it was shown that she was loaded at Newport News with 1,854 tons of coal, after which she lay in the stream until later taken in tow. Her own master, Captain Thomas, admitted that during the time she was in the stream she leaked between a foot and a foot and a half in 24 hours. And when taken on board the tug, Captain Thomas stated that the barge "was leaking when she left Hampton Roads and always has leaked." There was also testimony of Captain King, master of the Olwine, which was the barge directly ahead, that during the daytime the Northern 30 was "constantly pumping from Cape Henry on up." On this testimony, I am clear that the Northern 30 was unseaworthy, especially as one of the witnesses for the barge owner, who qualified as an expert, admitted that a barge which leaked more than 5 inches in 24 hours was not fit to go to sea.

But it is urged that the testimony appearing in the record with respect to the statements made by the masters of the two barges was incompetent as hearsay, and should be disregarded. This clearly is not the rule in admiralty, where declarations of a master are admissible, even though not part of the res gestæ. The Potomac, 8 Wall. 590, 19 L. Ed. 511; The Enterprise, Fed. Cas. 4497; The W. Talbot Dodge (D. C.) 15 F.(2d) 459, 1927 A. M. C. 94.

The question then arises whether the towage was negligently performed. The tugs were not insurers, but were required to use reasonable care and skill in the service they had undertaken. They were bound to respect barometer readings and weather indications; and for failure to do so are liable for resulting damage. The Hercules (C. C. A.) 73 F. 255; Maryland Transp. Co. v. Dempsey (C. C. A.) 279 F. 94; The Victoria (D. C.) 79 F. 122.

Were then the tugs negligent? Unquestionably, the weather conditions were favorable for both tows at least until after sundown on March 8th. The only disquieting sign later in that evening was the ring around the moon. I do not think though that this, standing by itself, was any indication of impending storm. Nor was there anything unfavorable in the barometer readings on March 7th or 8th. These readings up to midnight on the 8th showed only normal fluctuations, ranging from 30.44 to 30.12, with no sudden movements in either direction.

The Hooper tow passed the breakwater about midnight on the 8th, and at 12:45 a. m. on the 9th was at McCries buoy, which was opposite Cape May. The glass reading at that point was 30.30, the wind moderate, south southeast, the sky overcast, and the sea smooth. The barometer from then on dropped gradually, but almost steadily, until 12 o'clock noon of the 9th, when it registered 29.88. The wind in the meantime had shifted to southeast and east-southeast, and when the tug hauled head to the sea at 12 o'clock noon, it was raining hard, the wind was east-southeast and blowing a gale, and the sea was rough.

It is insisted that because the wind backed into the southeast, and the weather became overcast, after passing McCries buoy, the tug should have anticipated an easterly gale and returned to the breakwater, particularly as Delaware breakwater was the only port of refuge available between the Capes and New York. Captain Savage testified, however, that he thought the wind would work around into the northwest; and I cannot say his judgment in that respect was unwarranted. Certainly there was nothing in the recession of the barometer until after 11:50 a. m. on the 9th to cause anxiety; and, when the storm broke at 12 o'clock noon on that day, it was too late to turn back. To have done so would have subjected the barges to much more severe punishment from the storm than they actually received.

The Montrose tow reached Five Fathom Lightship at 12:30 a. m. on the 9th. This was opposite McCries buoy, and a short distance beyond the breakwater. The barometer was then 30.32, the wind southeast moderate, the weather cloudy, and the sea smooth. At 2:54 a. m. the wind had shifted to south-southeast, and the glass stood at 30.25. From then on, there was little change in the conditions until 7:35 a. m., when the barometer fell to 30.04, and the wind became southeast and increasing in strength. At 10:20 a. m. the tug hauled head to the sea at Brigantine Gas buoy, and the sea was then making strong, with the wind east-southeast. Afterwards, there was a rapid drop in the barometer, and the storm reached its height between 1 and 3 p. m.

Up to the time the Montrose hauled head to the sea, at 10:20 a. m. on the 9th, I do not think there was anything in the weather conditions which required a return to the breakwater. And at 10:20 a. m. on the 9th, the tow was more than nine hours sailing, or at least forty miles north of North East End

light vessel. To have turned at that point would only have made matters worse, and have subjected the barges to unnecessary hazard. The E. Luckenback (D. C.) 109 F. 487, affirmed The E. Luckenbach (C. C. A.) 113 F. 1017; The Mohegan (C. C. A.) 28 F.(2d) 795; The A. L. Walker (D. C.) 45 F.(2d) 621.

It is insisted, however, that the strongest argument against the tugs is to be found in the action of the other tugs, which put out from the Capes with the Hooper and Montrose tows, and went into Delaware breakwater on the evening of March 8th; or, as stated by Judge Soper in the A. L. Walker, supra, at page 624 of 45 F.(2d): "It is not often that a tribunal in a case of negligence finds the 'ordinarily prudent man' in the flesh and close at hand."

The only other tugs with three loaded barges, besides the Hooper and Montrose, leaving the Virginia Capes, bound north on the afternoon of March 7th, were the Waltham, A. L. Walker, Menominee, and Mars; and all four of these tugs put into Delaware breakwater on the afternoon or evening of March 8th. The masters of the Mars, Waltham, and Menominee all testified at the trial and told why they went into the breakwater. The master of the A. L. Walker was not, however, called, and his motive for going in must therefore be left to conjecture. Captain Miller of the Mars testified that his vessel was equipped with a radio set, and that about noon on March 8th, he received a radio weather report that the wind "was going easterly and increase in force"; and he went into the breakwater on the strength of this report, and also because of general weather conditions, which looked to him like a "breeder." Captain Curtis of the Waltham testified that he received three weather reports on March 8th, at 10:05 a. m., noon, and at 3:45 p. m., and that his decision to go into the breakwater was due mainly to those reports. He admitted, however, that he saw two other tugs preceding him in, and that this had considerable influence on his decision. Captain Powell of the Menominee likewise received the weather report broadcast from the Naval Station at Arlington at 10:05 a. m. on March 8th, that the wind "was going to be diminishingly northeast and was coming east and southeast increasing on Friday." He also testified that he received a similar radio report at 3:45 p. m. on the same day. And it was because of these reports, coupled with the fact that he saw three other tugs

making for the breakwater, that he was led to put in there.

From a careful reading of the testimony of the masters of these three tugs, I am satisfied that the radio reports on the 8th were what induced those tugs and tows to enter the breakwater, and that without such reports none of the tugs would have stopped there. I think, therefore, that unless the Hooper and Montrose were under a duty to have radio apparatus capable of receiving reports of that kind, the charge against them of negligence must necessarily fail.

■■ This raises the question whether the Hooper and Montrose were required to have effective radio sets to pick up weather reports broadcast along the coast. Concededly, there is no statutory law on the subject applicable to tugs of that type, the radio statute applying only to steamers "licensed to carry, or carrying, fifty or more persons;" and excepting by its terms "steamers plying between ports, or places, less than two hundred miles apart." U. S. Code Annotated, title 46, § 484. The standard of seaworthiness is not, however, dependent on statutory enactment, or condemned to inertia or rigidity, but changes "with advancing knowledge, experience, and the changed appliances of navigation." The Titania (D. C.) 19 F. 101, 106; The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65. It is particularly affected by new devices of demonstrated worth, which have become recognized as regular equipment by common usage.

Radio broadcasting was no new or untried thing in March, 1928. Everywhere, and in almost every field of activity, it was being utilized as an aid to communication, and for the dissemination of information. And that radio sets were in widespread use on vessels of all kinds is clearly indicated by the testimony in this case. Twice a day the government broadcast from Arlington weather reports forecasting weather conditions. Clearly this was important information which navigators could not afford to ignore.

Captain Powell, master of the Menominee, who was a witness for the tugs, testified that prior to March, 1928, his tug, and all other seagoing tugs of his company, were equipped by the owner with efficient radio sets, and that he regarded a radio as part "of the necessary equipment" of every reasonably well-equipped tug in the coastwise service. He further testified that 90 per cent. of the coastwise tugs operating along the coast were so equipped. It is, of course, true that many of these radio sets were the personal property of the tug master, and not supplied by the owner. This was so with the Mars, Waltham, and Menominee; but, notwithstanding that fact, the use of the radio was shown to be so extensive as to amount almost to a universal practice in the navigation of coastwise tugs along the coast. I think therefore there was a duty on the part of the tug owner to supply effective receiving sets.

■ How have the tugs met this requirement? The Hooper had a radio set which belonged to her master, but was practically useless even before the tug left Hampton Roads, and was generally out of order. Similarly, the radio on the Montrose was the personal property of Captain Walton, and was "a home made set," which was not in very good working order, and was admittedly ineffective. Neither tug received any of the radio reports broadcast on March 8th. And Captain Savage of the Hooper admitted that if he had received such reports he would "quite likely" have turned into the breakwater. Later, he qualified this statement, but I have no reason to doubt that his first answer expressed his real opinion on the subject. Likewise, Captain Walton of the Montrose admitted that if he had received the weather reports on the 8th, which were received by the other tug captains, he "certainly would have gone into Breakwater." I cannot escape the conclusion, therefore, that if the two tugs had had proper radios, in good working order, on March 8th, they would have followed the Mars, Waltham, A. L. Walker, and Menominee into the breakwater, and would have avoided the storm which overtook them on March 9th.

I do not think there is anything in the suggestion that the two tugs were racing to New York, as there is nothing in the record to support such a contention.

I hold therefore (1) that the libels of the cargo owners against the owners of the barges have been sustained; (2) that the tugs T. J. Hooper and Montrose were unseaworthy in failing to have effective radio sets, capable of receiving weather reports on March 8th, and that the limitation proceedings instituted in their behalf should be denied; (3) that the claims of the cargo owners against the tugs should be allowed; (4) that the damage sustained by the cargo owners should be divided between the owner of the tugs and the owner of the

112

barges; (5) that the owner of the barges is entitled to recover half damages against the tugs; and (6) that the successful parties are entitled to costs.