THE PROVIDENCE.

THE ELMHURST.

NEW ENGLAND S. S. CO. v. CITY OF NEW YORK.

CITY OF NEW YORK v. NEW ENGLAND S. S. CO.

District Court, S. D. New York.
March 18, 1933.

Haight, Smith, Griffin & Deming, of New York City (Henry M. Hewitt, of New York City, of counsel), for New England S. S. Co.

Arthur J. W. Hilly, Corp. Counsel, of New York City (Charles J. Carroll, of Brooklyn, N. Y., of counsel), for City of New York.

WOOLSEY, District Judge.

My judgment in this case is that the ferryboat Connolly, now the Elmhurst, is solely to blame for the collision.

Consequently, there should be an interlocutory decree in the first above-mentioned causes, A. 104/193, with an order of reference to assess the damages, and the cross-libel, A. 110/188, should be dismissed.

The New England Steamship Company may have costs on both libel and cross-libel.

I. The steamship Providence is a Sound steamer which runs between New Bedford, Mass., and New York City. Her length is 400 feet over all, 379 feet between perpendiculars; she has a beam of 50 feet.

The ferryboat Elmhurst, which will be hereinafter referred to as the Connolly, which was her name at the time of the collision, is 151 feet long, and has a beam of 37.6 feet. At the time in question the Connolly's regular ferry run was from Clason Point to College Point and back.

II. On the evening of September 23, 1929, the steamship Providence left New Bedford, Mass., on her scheduled trip to New York.

On the morning of September 24th, at about 3:58 a. m., when she was off Execution Light, she ran into a heavy fog. She kept on her voyage at reduced speed until 5:15 a. m., when she reached a point some 800 feet to the westward of College Point Bell Buoy. Her captain realized where she was by the ringing of the bell on the ferry racks at Clason Point which was then abaft her beam. The Providence had traversed the distance from Execution Light to this point in an hour and seventeen minutes as against her usual schedule of thirty-five minutes.

As the fog continued, her captain decided to anchor there because the fog was still very heavy; and he could hear the bells of anchored vessels ahead of him. He felt that he would soon be getting into heavy river traffic and realized that, if he continued further before anchoring, he might not keep clear of the anchored vessels which he had heard ahead, when, as she inevitably would after his anchor was dropped, the Providence swung with the tide which was then towards the end of the ebb. Consequently, he anchored with about 210 feet of chain out.

Almost as soon as the Providence was anchored she began to swing with the ebb tide until, when she brought up, she was pointing eastward in the direction from which she had just come. This meant that she had swung on her anchor in a half circle with a radius of about 600 feet, composed of her own length of 400 feet and her anchor chain of about 210 feet.

The fog was then so thick that from the pilot house of the Providence it was just possible to see her flag staff on her bow, 50 feet away.

I hold that under the circumstances shown the Providence was not in fault for anchoring where she did; for the choice of what should be done in such a situation should be left to the decision of the expert on the spot if there is a fair choice between the possible courses to be followed. Cf. The Mohegan, 28 F.(2d) 795, 796 (C. C. A. 2); The Haven, 277 F. 957, 959 (C. C. A. 2).

Nor was the Providence at fault thereafter, for so soon as she anchored she began to ring her fog bell, and whilst she was at anchor it was rung in accordance with the statutory requirements. Her fog bell was a proper bell, properly located. It was 2½ feet across, and 2½ feet high, and was situated on the mast at the after end of the pilot house slightly more than 50 feet from her bow.

III. It is common ground that the ferryboat Connolly, in operating between Clason Point and College Point had passed the anchored Providence four times because after the Providence anchored, the Connolly made two round trips from Clason Point to College Point before the trip on which the collision occurred.

Those in charge of the Connolly said that they did not hear the bell of the Providence on any of the trips on which they had passed her. They claim first to have heard the bell of the Providence about two or three minutes before they came into collision with her.

If it be true that those in charge of the Connolly did not hear the bell of the Providence as they passed her on the two round trips she made before the collision, it must have been due to inattention on their part. But that is immaterial here for when we come to the trip on which the collision occurred,

they admit having heard the bell of the Providence for at least two minutes before the Connolly struck her.

I find that the Providence was lying at the time of the collision at about the point marked A on the Respondent's Exhibit 1. The point of contact was on the port side of the Providence, about 75 feet forward of the stern. The angle of collision was substantially a right angle.

The distance from the place where the Providence was lying at anchor to the ferry slip in straight line was about 940 yards or 2,820 feet, and the distance traversed by the Connolly from her slip to the Providence was more than this distance because she did not proceed in a straight line.

The Connolly left her slip at Clason Point at 6:46 a. m. and the collision occurred at 6:51 a. m. The Connolly had, therefore, traversed at least 2,820 feet in five minutes which would be at the rate of at least 564 feet per minute. For practical purposes the number of hundred feet per minute traversed by a vessel is the same as the number of miles per hour at which she is proceeding. Consequently, the speed of the Connolly must have averaged at least 5½ miles per hour whilst she was traversing the distance between her slip and the Providence. Inasmuch as the Connolly started without any headway and gradually accumulated headway she was undoubtedly proceeding, when, two minutes before the collision, she heard the bell of the Providence, at a speed of at least 5½ miles per hour. After the Connolly heard the bell of the Providence she proceeded more cautiously, and those in charge of her say that the sound of the bell widened on the Connolly's port bow. This is explainable, of course, by the fact that she was approaching the after part of the Providence, and the sound of the latter's bell, which was only 50 feet from the bow of the Providence and some 300 feet from her stern, would naturally seem to be broadening out on the Connolly's port side as she approached nearer.

But the Connolly's captain admits that he knew that a Sound steamer was at anchor there and that he was trying to pass under her stern. So the phenomenon observed about her bell should have led him to the greatest caution.

I find that the Connolly was proceeding at such a rate of speed that she was not able to stop within the distance of visibility which is the required standard of speed in fog for ferryboats as well as other craft. The Nacoochee, 137 U. S. 330, 339, 11 S. Ct. 122,

34 L. Ed. 687; New York Central Railroad v. City of New York, 19 F.(2d) 294, 295 (C. C. A. 2); The Rosaleen (C. C. A.) 214 F. 252, 254. Consequently, she has not overcome the presumption of fault arising from her collision with an anchored vessel. Cf. The Youngstown, 40 F.(2d) 420, 421 (C. C. A. 2).

IV. This opinion may stand in lieu of any findings of fact or conclusions of law herein. This may be so provided either in the decrees above provided for or by separate orders.

Settle decrees on notice.