**THE HANS MAERSK.**

**THE IDA HAY ATWATER.**

**HANSEN v. GODFREY.**

No. 4097.

Circuit Court of Appeals, Fourth Circuit.

Jan. 5, 1937.

Leon T. Seawell, of Norfolk, Va. (Hughes, Little & Seawell, of Norfolk, Va., on the brief), for appellant.

Braden Vandeventer, of Norfolk, Va. (Vandeventer & Black, of Norfolk, Va., on the brief), for appellee.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

On the morning of May 3, 1934, a collision occurred in a dense fog in the Thimble Shoal Channel approaching the port of Norfolk, Va., between the American steamship Ida Hay Atwater and the Danish steamship Hans Maersk. The Atwater is a vessel 253.4 feet long, 43.6 feet beam, with a draft when loaded of 25.1 feet; but she was light at the time and was drawing only 7 feet forward and 16 feet aft. The Maersk is a vessel 281.3 feet long, 40.2 feet beam, with a draft when loaded of 19.1 feet. Her actual draft on this occasion was 18.3 feet forward and 18.11 feet aft. The width of the channel is 900 feet. The Atwater was proceeding westwardly toward the port of Norfolk, and the Maersk was bound eastwardly on her way to Trinidad with a load of coal.

The bow of the Maersk came in contact with the port side of the Atwater a little aft of amidships at an angle between the vessels of about 45 degrees. The port side of the Atwater was dented in and one of her plates was punctured by the flukes of the port anchor hanging in the hawse pipe of the Maersk, and the port side of the Atwater was scraped for some distance. The Maersk, which dropped her starboard anchor shortly before the collision, was damaged at the bow, in that the stem bar was bent over to port at an angle of 90 degrees. Cross-libels were filed.

The District Judge discussed the evidence at some length and found that the Maersk was solely at fault and exonerated the Atwater. He found that the Maersk was at fault in three particulars: (1) In being in the cut channel as she proceeded outwardly from her berth; (2) in not sounding fog signals, but relying upon those of a following steamer; and (3) in proceeding through a dense fog at an excessive rate of speed. The judge also found that shortly before the collision, the Maersk negligently turned abruptly to port bringing her into contact with the Atwater. We find ample support in the evidence for the findings of the court as to the Maersk, and have no doubt that the collision occurred in the dredge channel and that the Maersk was proceeding at an excessive rate of speed in view of the circumstances, and that except for these errors, the accident would not have happened.

The judge failed to sustain the countercharges that the Atwater was at fault because she lost her way in the fog and in-

stead of anchoring until clearer weather, proceeded on her way and, finding herself on the south side of the channel, was endeavoring to go to the north side when she crossed the bow of the Maersk and brought about the collision. A charge that the Atwater was at fault in using the cut channel was also overruled because the judge was of the opinion that she was entitled to use the channel in view of the fact that her potential draft exceeded 20 feet. It will be sufficient to consider the last-mentioned finding. In our opinion, the vessel had no right under the regulations to proceed in the cut channel, and since it cannot be said that her presence in the channel did not contribute in any way to the collision, she must be held partly responsible for the ensuing damages.

The rule promulgated by the Secretary of War with reference to the use of the channel is as follows: "The use and navigation of Thimble Shoal Channel is hereby restricted to vessels of 20 feet draft or greater, to towboats with tows drawing 20 feet or more, and to passenger ships of less draft." See U. S. Coast Pilot, Atlantic Coast, Sec. C, Sandy Hook to Cape Henry, (1930), p. 112, and supplement of June 27, 1935, p. 18.

It is contended on behalf of the Atwater that the rule refers to the potential rather than to the actual draft of vessels, with the result that the Maersk, with an actual draft of 18.11 feet at the time of the accident and a possible draft of 19.1, was not entitled to use the channel; while the Atwater, with an actual draft of only 16 feet at the deepest point and a possible draft of 25.1, could lawfully proceed therein. It may be admitted that there is room for doubt as to the construction of the rule if.the literal meaning of the words is alone considered. However, when the obvious purpose of the rule is considered, that the channel may be reserved for vessels in need of great depth of water in order to ensure their safety and convenience, it is apparent that vessels actually drawing less than 20 feet are barred; and this interpretation becomes the more clear in view of the ample depth of water for vessels of even greater draft than 20 feet for long distances on both sides of the dredged channel. In support of this construction of the rule we have been furnished by counsel for both parties with an opinion of the Secretary of the War Department, holding that the rule refers to the draft of a vessel at the time of navigating the channel

and not to the potential draft and stating that this meaning is clearly indicated in the reasons advanced for modification of the former regulation at a public hearing prior to the adoption of the present rule. The trial court did not have the benefit of this information.

It is said that even if the Atwater had no right to be in the channel, she is not chargeable with responsibility for the collision because her presence in the channel was not due to neglect but to an error of judgment which is excusable under the circumstances. The master of the vessel testified that proceeding westerly from Cape Henry, he heard the bell of a vessel at anchor on his port side at a point halfway between Cape Henry and the entrance to the channel, and that he knew that vessels bound for Norfolk were likely to anchor at any time after passing Cape Henry. He entered the channel in a dense fog with a visibility of about 500 feet. As he entered, he noticed a red buoy close on his starboard side which he took to be red buoy No. 2 marking the north side of the entrance to the channel although he could not make out the number; and he heard on his port the bell buoy marking the entrance of the channel on the south. It was his intention to go to the north of the channel, and believing that the tide would gradually take him towards the south, he altered his course seven-eighths of a point in a northerly direction so as to come to anchor north of red buoy No. 6. Three times in all he altered his course a little to the north, as he believed he was sagging southward. Proceeding on his course, he cleared red buoy No. 4 at a distance of 100 feet on his port side, and a minute later, hearing a whistle ahead from a vessel hidden by the fog, he stopped his engines. According to the log of the vessel, the collision occurred 14 minutes later, and during this period, the engines were put slow ahead, full astern, full ahead, or stopped for various intervals. It is contended on behalf of the vessel that if the collision occurred in the channel, it was due to the fact that the tide carried her in a southerly direction after her speed was checked upon hearing the whistle of the approaching vessel.

The place of collision was fixed by the District Judge near or slightly to the north of the center of the channel, and we accept this finding in view of all the evidence, notwithstanding the belief of the master of the Atwater that it occurred north of the channel. Having reached this

conclusion, we do not think that the vessel should be freed from liability, even if the testimony of the master of the vessel is accepted as to the course which he took from the entrance of the channel to red buoy No. 4. The buoys which mark the edge of the channel could not be seen unless they were close at hand and none was visible when the collision occurred. But it was nevertheless the duty of the master to keep his vessel outside the channel; and since he could not be certain of his whereabouts after he left a buoy behind, he should have anchored outside the channel or altered his course to a greater extent when he knew where he was, as for example, when he passed buoy No. 4 on his port hand. It is generally held that in a dense fog it is the duty of a steam vessel to anchor in a permissible anchorage as soon as circumstances will permit, although there is no duty to anchor in a thoroughfare which will endanger herself and others as much as to continue with extreme caution. The Persian (C.C.A.) 181 F. 439, 447; The Mohegan (C.C.A.) 28 F.(2d) 795. The master of the Atwater had been familiar with the waters at the entrance of the Chesapeake Bay for fifteen years, and on this occasion, realizing the wisdom of anchoring, had intended to do so when he reached a point to the north of buoy No. 6. He knew that it was the custom of vessels to anchor in this general locality after they passed Cape Henry; and there was no reason for him to proceed as far as buoy No. 6 before coming to a stop. He went on at his own risk, and having entered the dredged channel contrary to the terms of the rule, he must share in the responsibility for the accident that ensued. For these reasons it is our opinion that the decree of the District Court should be modified so as to divide the damages between the two vessels.

Modified.