## THE HERCULES.

### NEALL v. GENTHNER.

(Circuit Court of Appeals, Second Circuit. February 20, 1896.)

**1. Towage—Loss of Barge—Liability of Tug.**

A tug, with two coal-laden, sea-going barges, left Delaware Bay for Providence, in the afternoon, after delaying several hours on account of a threatened easterly storm. At the time of starting, the wind had shifted to west-northwest, and was blowing about 10 miles an hour, which was a favorable wind for the voyage. The masters of both tugs assented to starting at that time. After midnight, when the vessels had proceeded about 21 miles, the wind increased, and there was thick snow, and during the following day there was a gale from the north-northwest. Little progress was made, but no damage was done until late in the evening, when a heavy sea struck one of the barges, and caused her to spring a leak, from which she sunk, and was totally lost. *Held,* that the tug was not liable, either on the ground that her master was not warranted in leaving the breakwater in the condition of the weather, or because he did not turn back when he found the storm increasing, there being apparently as much danger, from the shoals near the Capes, in attempting to regain the breakwater in the darkness, as in continuing to face the storm, and it also appearing that the barge was old, and had a weak bottom. 63 Fed. 268, reversed.

**2. Same—Conduct of Master.**

A tug is not to be *held* liable for the loss of a tow merely because her master, in an emergency, did not do precisely what, after the event, others may think would have been best. If he acted with an honest intent to do his duty, and exercised the reasonable discretion of an experienced master, the tug should be exonerated.

Appeal from the District Court of the United States for the Eastern District of New York.

This was a libel in rem by Philip J. Genthner against the steam tug Hercules (Frank L. Neall, trustee, claimant) to recover damages for the loss of the barge Saugerties. The district court rendered a decree in favor of libelant (63 Fed. 268), and the claimant appealed.

Robinson, Biddle & Ward (Henry Galbraith Ward, advocate), for appellant.

Benedict & Benedict (Robert D. Benedict, advocate), for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

PER CURIAM. In the afternoon of March 3, 1893, the tug Hercules, having in tow the barges Saugerties and Moonbeam, both laden with coal, left Delaware Bay for the port of Providence, passing the breakwater at 5:30 p. m. About 11 o'clock in the evening of the next day, the Saugerties having sprung a leak, and being about to sink, her crew were taken on board the tug, and soon after she sunk, and became, with her cargo, a total loss. Her owner brought this action to recover the value of the barge and her cargo, upon the theory that the loss was occasioned by the negligence of the tug in starting on the voyage in the face of a threatened gale, and, after starting, when it had come on to blow a gale, and while yet within easy reach of the Delaware breakwater, in not turning about, and seeking safety. The district judge was of the opinion that the tug put to sea with

the barges, "in the face of evident signs of approaching storm," but placed his decision upon the ground that she was "guilty of continuing to face a dangerous storm after she experienced its force, when common prudence required her master to turn back, and seek the shelter of the breakwater." We are constrained to differ with the learned district judge in respect to each of these conclusions. It will not be profitable to rehearse or analyze the evidence found in the voluminous record, much of which was not taken in the presence of the district judge. The facts shown by a decided preponderance of proof are these:

The tug belonged to the Red Star line, was a strong, thoroughly equipped vessel, and was in command of an experienced master, who had no interest or motive to induce him to expose the barges, or his employer, to the consequences of a dangerous voyage. He had brought the barges down the river, and anchored them there early in the forenoon, because he thought the weather indications unpropitious. These denoted an easterly storm, with snow, and the wind from that direction would have been inshore. The weather continued threatening during the forenoon, but in the afternoon there was a favorable change, and, when the vessels left, the wind, which had worked around from the southeast to the southward and then into the westward, was blowing about 10 miles an hour from the west-northwest, indicating a fresh breeze from the northwest,—a favorable wind for the proposed voyage. The barges were seagoing ships, cut down, and, as loaded, had ample freeboard; that of the Saugerties being seven feet. The masters of both barges acquiesced in starting, and so, also, did the superintendent of the Red Star line, who was near by. After passing the Capes, the vessels proceeded slowly against a head sea, making the Five-Fathom Bank lightship, distant 21 miles from the breakwater, at 1:15 a. m. Between midnight and the next morning, the wind increased, and at 4 a. m., March 4th, there was thick snow, which continued at intervals, with increasing wind, until 4:30 p. m., at which time the wind was blowing a gale from the north-northwest. From this time until about 8 o'clock p. m. the gale increased, shifting to the northwest. After passing the Five-Fathom Bank lightship, the vessels made very slow progress, and from the morning of the 4th, when they had gone about 10 miles from the lightship, throughout the day, the tug did not attempt to do more than hold the barges up against the wind.

It is apparent that, throughout the day, until early evening, notwithstanding the severity of the gale, the barges did not suffer, and, indeed, did not experience any serious discomfort. They were not boarded by any considerable seas, and the storm racks were not used, at table, when dinner and supper were served. Neither those in charge of the tug nor in charge of the barges considered the situation dangerous, and the thought of turning back and attempting to reach the breakwater does not seem to have occurred to any of them. When the pumps were sounded on the Saugerties between 6 and 7 o'clock no water was found. A little later, however, a heavy sea struck her, which carried away her boats, and, the cabin door being open, some of it went into the cabin. An hour or so later she was found to be leak-

ing badly.   She had recently been overhauled, and caulked where the oakum had worked out of her seams.    The shipwright testifies, that, "in a general looking over, she looked pretty fair."  After she had been caulked, her bottom was in such condition that, if subjected to moderate strain, she would be likely to leak.   The master who had been in charge of her the previous fall testifies that she leaked constantly, that it was necessary to caulk her continually, and that he refused to sail with her again because he thought her unsafe.    There is evidence that, after she began to leak badly, her pumps could not be worked because the connections of her engine were out of order, but this may not be true.    About 9 p. m. her master signaled the tug for assistance.   The master of the tug, supposing the barge was only suffering from the bad weather, turned the vessels about, and ran before the sea.    An hour or so later the Saugerties signaled the tug again.   The master of the tug then broke the hawser between the tug and the Saugerties, pulled alongside the Saugerties, and the crew of the Saugerties got on board the tug.   While this was going on, the Moonbeam, whose hawser had been detached from the Saugerties, was adrift, and for some time continued drifting in the trough of the sea, when she was again taken in tow by the tug.   Although she was a smaller barge than the Saugerties, none of her crew, even at that time, thought her in serious danger. While thus drifting, or later in the night, she broke her tiller.   Her master repaired it as best he could, but later it was carried away again.   The gale moderated the next morning, but as the Moonbeam could not be steered, early in the afternoon, at the request of her master, the tug turned about, and took her back to the breakwater.

Doubtless the barges were exposed to a storm, after the morning of the 4th, which was dangerous, in the sense that some mishap to the steering gear, or even the parting of a hawser, might imperil them, and which was so severe that a vessel with a decrepit bottom would be likely to spring a leak.    If the master of the tug ought to have forecast such a storm, the dictates of prudence should have forbidden him to expose the barges to the chances, notwithstanding he was unaware of the weakness of the Saugerties.    But we are convinced that the weather conditions when he put to sea justified him in doing so, taking into consideration the character of his tug and the apparent seagoing qualities of the barges.    If he could have turned back at any time during the forenoon of the next day, and safely brought his vessels to the protection of the breakwater, it is apparent now, after the event, that it would have been the part of prudence to do so; but it was not so apparent then, and it cannot be confidently asserted that it would have been safer to have put back than to hold on.    The vessels drew 21 and 22 feet of water, respectively.    They were 30 miles from the Capes of the Delaware, and the wind was shifting more to the westerly.    The risk of taking them back, and attempting, in snow, and perhaps darkness, to avoid the shoals near the Capes, was apparently as menacing and real as any to which they were likely to be exposed by holding on in the face of the storm.    It would have been still more impracticable and hazardous to have made the at-

tempt later in the day. The situation was one where the judgment of the master of the tug ought not to be pronounced unwarranted, and certainly ought not to be treated as culpable. His conduct is approved by the master of the Moonbeam, a disinterested witness, who, from the deck of his own vessel, was able to appreciate the situation, throughout the day of the 4th, in all its bearings. In all probability, if the Saugerties had been a seaworthy vessel, she would have weathered the gale. The disaster which befell her is more properly attributable to her own unsoundness, than to any fault of the master of the tug. The tug is not to be held responsible because the master, in an emergency, did not do precisely what, after the event, others may think would have been best. If he acted, as we are satisfied he did, with an honest intent to do his duty, and exercised the reasonable discretion of an experienced master, she should be exonerated.

The decree is reversed, with costs, and instructions to the district court to dismiss the libel, with costs of that court.