## THE BUMP.

### GILDERSLEEVE SHIP BUILDING CO. v. SEABOARD SAND & GRAVEL CORPORATION et al.

### No. 12356.

District Court, E. D. New York.
Jan. 11, 1932.

Purdy & Purdy, of New York City (Edmund F. Lamb, of New York City, of counsel), for libelant.

Foley & Martin, of New York City (J. A. Martin and John R. Stewart, both of New York City, of counsel), for respondent Seaboard Sand & Gravel Corporation.

Macklin, Brown, Lenahan & Speer, of New York City (J. Dudley Eggleston and

204

Carl F. Vander Clute, both of New York City, of counsel), for respondent impleaded.

BYERS, District Judge.

On December 1, 1930, the scow Bump, the property of the libelant, was the fifth barge in a tow of six similar vessels which were towed from Port Morris by the tug Reichert Line, to Port Jefferson, Long Island. The tow was made up in tandem, single file, upon a 9-inch hawser of 60 fathoms. The scows were close coupled until after passing City Island, when hawsers were slackened away, to avoid bumping. Departure was had at about 1:30 o'clock in the afternoon, and the course followed after leaving City Island was along the Long Island shore.

Heavy weather was encountered east of Eaton Point, a northwest wind being responsible for this condition; between Eaton Point and Old Field Point, at a place which is not precisely shown, the hawsers between the first and second scows parted, and a Reichert tug, the Reichert Boys, which had joined the tow east of Hempstead Harbor, put a line on the second scow and so took the five remaining vessels in tow, intending to proceed with them to Port Jefferson Harbor; thereafter and somewhat west of the breakwater the last two vessels broke loose, and were carried east of Port Jefferson Harbor and beached at a point about a mile from the breakwater.

On the following day, and as soon as the force of the northwest wind abated, which was toward nightfall, they were hauled off the beach and taken to their destination, and the damage sustained by the Bump in that misadventure is the cause set forth in the libel filed by the owner against the Seaboard Sand & Gravel Corporation, the charterer. The latter has petitioned into the cause the Reichert Towing Line, Inc.; alleging negligence upon its part in undertaking the trip in the face of weather conditions, and in failing properly to handle the scows under the circumstances above referred to.

The real questions are whether departure from Port Morris should have been made at all; and, assuming that it should, whether haven should have been sought in one of the available points of refuge, when the weather conditions developed so as to bring about the result stated.

On November 30th, a storm warning was issued by the Weather Bureau, and the following forecast was issued:

"Hoist Southwest storm warning 12 noon Cape Hatteras to Provincetown, Mass. Disturbance centered over Indiana. Will move rapidly northeastward and will be attended by increasing southerly winds becoming stronger possibly reaching gale force late tonight and shifting to West or Northwest Monday."

The wind velocity during the afternoon of November 30th varied from 35 miles an hour to 45, with an occasional maximum during that period running as high as 48; the wind being from the south and southwest.

On December 1st, the wind continued out of the southwest until 5:00 o'clock in the morning, when it shifted to west and northwest, and continued in that quarter until noon, when it was in the west, and there remained until 5 p. m., when it shifted to southwest; between 6 and 7 o'clock, it changed to northwest, and continued in that quarter until midnight. At noon, the storm warning was taken down from the Whitehall building, and at Fort Schuyler, and not again displayed that day.

The wind velocity from the first hour of the day, December 1st, until noontime, diminished gradually from 37 miles to 13. Between 1 p. m., when the westerly wind set in, and 5 p. m., when it shifted to southwest, the velocity varied between 12 and 15 miles, with a maximum of 19 between 3 and 4 o'clock. At 6 p. m., there was a shift to the northwest, and velocity increased to 23; during the ensuing five hours the velocity varied from 33 to 39, the wind continuing in the same quarter, with a maximum attained, at times, of 45, and during the last hour it rose to a maximum of 51.

The barometer, which had been falling on the previous day, began to rise on the morning of December 1st until about 9 o'clock, when it began to fall; between that hour and 3 in the afternoon the total fall was $^{19}\!/_{100}$ of an inch. At 3 o'clock in the afternoon, it began to rise.

Mr. Scarr, of the Weather Bureau, testified that, without a barometer, the ordinary man would have thought, at noontime of December 1st, that the storm was over, but that the barometer readings, to a person possessing understanding thereof, would indicate that the center of the storm had not passed.

In the morning of December 1st, the weather was cloudy, but by noontime there was $^{9}\!/_{10}$ of possible sunshine, and the sun continued to prevail until 3 o'clock in the afternoon.

■ Under the conditions shown, can it be said that the captain of the tug was negli-

gent in starting out for Port Jefferson? It is thought that a negative answer to this question must be given for these reasons:

The storm warning of November 30th indicated west and northwest winds for December 1st, and such prevailed during the morning with constantly diminishing velocity from 26 miles at 9 a. m. to 13 at noontime; during the next hour the wind was from the west at 12 miles, and the sky had cleared and the sun was shining.

The only unfavorable indication was the fall of the barometer of ⅒ of an inch, between 9 o'clock a. m. and 3 p. m.; this was not a constant, and the barograph reading shown in libelant's brief indicates an actual rise between 9 o'clock and noon; the captain of the tug received his orders to take the tow to Port Jefferson at about 1 o'clock, and such fall as occurred between noon and the last-mentioned time can scarcely be thought to have pointed to any such development as actually occurred.

The fact that the storm warning had been taken down at noontime has a significance that cannot be overlooked in forming an estimate of the foresight reasonably to be required on the part of the tug's captain.

The fact that the course was laid along the Long Island shore, instead of the Connecticut shore, indicates that no severe blow from the northwest was anticipated, and none occurred until nearly five hours after departure.

There was chafing of the hawsers between the scows, during the course of the voyage, but one of the bargees testified that this was due to jumping caused by lumpy seas and a following wind, which caused the scows to pile up. Such would perhaps result from the southwest wind that blew between 5 and 6 p. m.

An examination of the authorities discloses no case in which the tug has been held, under facts which closely resemble those here presented.[1]

The question of the duty to seek shelter depends upon the place where dangerous conditions were encountered. If a finding be deemed requisite on this subject, it will be that the tow had reached a position east of Eaton Point, at the time when the second scow in the tow was parted from the first. It is thought that this occurred nearer to Old Field Point than Eaton Point, and that there was no sufficient protection from a northwest wind, in Smithtown Bay, to require that haven there should have been sought.

[1] Cf. Hercules (C. C. A.) 73 F. 255; Maryland Co (C. C. A.) 279 F. 94; Victoria (D. C.) 79 F. 122.

It is concluded that reasonable care and skill were displayed by the tug in initiating and carrying out the voyage in question, and that the libel against the tug must be dismissed with costs.

Proctors having stipulated that only secondary liability against the Seaboard Sand & Gravel Corporation is asserted by the owner of the scow, and that, unless the tug is to be held, the libel must be dismissed against the charterer, the decree will so provide, without costs.

Settle decree on notice.

If findings are desired, they must contain appropriate recitals of ownership and incorporation, and should also be settled on notice.