**M. P. HOWLETT, INC., Appellee,**

v.

**TUG MICHAEL MORAN, Tug Michael Moran, Inc. and Moran Towing & Transportation Co., Inc., Appellants.**

**No. 423, Docket 33635.**

United States Court of Appeals, Second Circuit.

Argued Jan. 19, 1970.

Decided April 16, 1970.

---

Kenneth H. Volk, New York City (Burlingham, Underwood, Wright, White & Lord, New York City), for appellants.

Stephen J. Buckley, Jr., New York City (Foley & Martin, New York City), for appellee.

Before MOORE, FRIENDLY and HAYS, Circuit Judges.

MOORE, Circuit Judge.

The tug Michael Moran, under the command of Captain William A. Morrissey, was engaged to tow the crane barge Howlett No. 6 from Port Richmond, Staten Island to Weehawken, New Jersey and berth it stern to shore on the south side of Pier 9. Toward the end of the trip Morrissey noticed that the draft of the barge had changed and it looked as if it were taking on water. He sent his deckhand to check, and his suspicions were confirmed. The cause of the barge's drawing water was not evident at that time but several days later it was discovered to be due to a rusted-out exhaust pipe which allowed water coming in the stern exhaust hole to leak into the stern belowdeck compartment. This defect rendered the barge unseaworthy, as the district court found. Nevertheless, negligence on the part of the tug was found to have caused the ensuing damage because Judge Cannella was persuaded that Morrissey could have saved her had he exercised prudent seamanship under the circumstances. Liability was found to arise from the following sequence of events.

Shortly after 9:00 o'clock that night Morrissey brought the leaking barge into its berth at Pier 9. His crew got out their pumping equipment, and sought a hole into the flooded compartment through which they could pump out the water. Using a sledge hammer and crow bar, the deckhand and engineer tried to open the deck plate (manhole cover) nearest to the leaking compartment. They were unable to open it, and gave up after approximately 20 minutes, because the stern area was by then awash. The crew then tried other deck plates, one of which they were able to open, but were unable to gain access to the waterfilled stern compartment. Their uncontradicted testimony is that, from the time of berthing (roughly 9:15 p.m.) to the time the tug cast off and the barge capsized, the two crew members were engaged in

seeking some way to pump out the water in the stern compartment.[1]

Meanwhile, Morrissey searched the dock area for someone who could tell them how to get into the flooded compartment or give them some advice as to how to keep the barge afloat. Finding no one near the docks, he broke into the Howlett telephone shed near the dock and attempted to call the barge owner. He also communicated with his own dispatcher. Apparently the Howlett owner's telephone gave a busy signal for some time because an operator, eventually contacted either by the captain or his dispatcher, suggested that the phone probably was off the hook.[2] At any rate, Morrissey's approach to the problem was to keep his tug alongside the barge and tied to it while his men sought vainly to find a way to pump out the water, with the captain himself intermittently looking for outside help.

Two hours after the berthing, at approximately 11:15 p.m., Morrissey decided that further efforts were futile, and that to stay alongside any longer would imperil the tug and its crew, because the barge had been listing toward the tug and the lines between the two were taut and humming. Morrissey ordered the deckhand to cast off. Two of the lines were loosed, and the barge keeled over toward the tug, which was backing out. The crane on the barge had been locked in vertical position, making the barge topheavy once the water in the stern compartment had altered its stability, and the crane led the way as she capsized, missing the tug by about five feet.

Two expert witnesses (tug captains) for appellee Howlett testified that under any circumstances they would have tried to beach the barge. They testified that near the pier in question is an expanse of mud flats which are visible at low tide. It was not low tide when the above events occurred and Morrissey testified that all he could see was water when he entered into the area shortly after 9:00 p.m. He

1. The testimony is somewhat confusing because the ambiguous phrasing of certain questions put to witnesses Pusty and Larsen (the tug's deckhand and engineer, respectively) produced some misleading or contradictory responses. For example, on direct examination Larsen was asked the following question and gave the affirmative response indicated:

Q. To make it very clear, is it your testimony that at all times from the time at least when the barge—at all times when the barge was alongside the pier you were making these efforts?
A. Yes.

Then followed questioning by the court, which revealed that, by Larsen's estimate, he and Pusty spent about 20 minutes attempting to get the starboard stern deckplate and one other deckplate off. The court apparently concluded from this that all efforts of any description terminated after 20 minutes, the point at which the starboard stern deckplate became awash. Morrissey testified, however, that he assisted the crewmen with a midship deckplate when he returned to the pier after 10:00 o'clock. Larsen had earlier testified that his and Pusty's efforts were continuous "all the time that we were alongside of her" and in the next breath estimated that they had "worked on it for about 20 minutes or more. It's hard to

tell when you are in a situation like that."

Pusty's testimony likewise indicates that for most of the time the tug and barge were tied to the pier, he and Larsen were at least intermittently engaged in various activities directed at finding a way to keep the barge afloat. However, he, too, indicated that after 20 minutes they gave up on reaching the flooded compartment through the stern manhole covers.

We do not rely to any great extent on any of the time estimates contained in the testimony because the nearly five years intervening between accident and trial obviously clouded the recollection of everyone concerned. It is sufficient to observe that the testimony suggests that the crew stayed with the barge and tried everything they could think of to find a way to get their pumps to the water which was steadily sinking the barge.

2. At the trial, Morrissey testified that "I must have dialed the number 10 or 15 times. The operator finally told me that one of the phones was apparently off the hook." In a deposition taken by Howlett in 1965, nine months after the capsizing occurred, Morrissey stated that his dispatcher had gotten that information from the operator and subsequently relayed it to him.

also testified that he had no knowledge of what lay under the surface in those waters and was apprehensive about the possibility of underwater wreckage or sunken objects along the shore outside the immediate area of the pier. Nevertheless, the experts were of the opinion that everyone operating in New York harbor should know about the flats and that the area was free of dangerous objects below the surface of the water. Judge Cannella agreed and found that the prudent course of action would have been to attempt to beach the barge when the captain discovered that he would be unable to pump the water out of the barge. Neither the expert witnesses nor the trial court were able to specify at what point in time this decision should have been made, nor did they indicate what effect the list of the already unstable, topheavy barge would have had on their judgment had they been in precisely the same circumstances in the same two-hour period. Appellant argues that after the list became severe, any attempt to beach the barge would have resulted in capsizing it and a consequent law suit for negligence in attempting to beach it under those circumstances. It appears from Morrissey's testimony, however, that he did not in fact consider beaching the barge, but concentrated his efforts on trying to pump her out or get some advice from the crane barge's owner. The district court determined that spending two hours looking for a hole to pump through and trying to call the owner was not the prudent thing to do under the circumstances. He held that failure to try one of the alternative methods of beaching the barge suggested by appellee's expert witnesses at the trial was negligence.

The conclusion that the captain was at fault rested on a finding by the trial court that a "reasonably prudent tug captain in the same or similar circumstances" would have made an attempt to beach the Howlett No. 6, and the correlative finding that such an attempt would have been feasible. These crucial findings were based entirely on the testimony of Howlett's two expert witnesses, for there is no evidence outside this testimony that beaching was an alternative which a captain in these circumstances could or should have considered.

In faulting the master of a tug for choosing one course of action over others that may have been available in situations requiring judgment under conditions of abnormal stress, we must be careful to "judge the conduct of the master of a vessel in the light of the circumstances which he faced at that time * * * and not as they may have appeared to one looking back at them several hours or several days later." Esso Standard Oil, S.A. v. S.S. Casbras Sul, 387 F.2d 573, 582 (2d Cir. 1968). The transcript of the expert testimony in the case before us compels the conclusion that consideration was not given to the crucial factors which complicated Morrissey's decision at the time he was required to act, and therefore the assertions of these experts, based as they are on incomplete facts together with hindsight, cannot support the conclusion that the captain's failure to beach the barge was a failure to exercise "the reasonable discretion of an experienced master." The Hercules, 73 F. 255, 258, 19 CCA 496 (2d Cir. 1896).

█ Both Captain Brucato and Captain Smith, the two expert tug masters produced by Howlett, agreed that the proper course of action initially was to try to pump the water out of the sinking barge. Neither was told that the tug Moran's crew were unable to gain access to the flooding belowdeck compartment, and both assumed throughout that the problem was that "the pumps weren't holding." Neither witness was able to provide a comprehending or comprehensible response to questions regarding the effect upon a normally competent tug master's judgment which certain facts such as the severity of the barge's list, the effect of the vertically positioned crane boom and the rate at which the barge was sinking would obviously have under such circumstances. The transcript of cross-examination of both Brucato and Smith indicates that the experts

either did not understand the questions put to them or they declined to answer them in favor of the rote response that "the pumps weren't holding and she should have been beached." Their testimony that an attempt to beach the barge was the only prudent thing to do under any circumstances sheds no light at all on the reasonableness of Morrissey's response to the unique emergency with which he was confronted at the time he acted. In the absence of consideration of the particular circumstances facing the captain in his hour of decision, a finding of negligence for his failure to beach the barge can only be based on hindsight. "The tug is not to be held responsible because the master, in an emergency, did not do precisely what, after the event, others may think would have been best." The Hercules, 73 F. 255, 258 (2d Cir. 1896).

■■■ Under normal conditions, negligence is shown by proving the tug's failure "to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service." Stevens v. The White City, 285 U.S. 195, 202, 52 S.Ct. 347, 350, 76 L.Ed. 699 (1932). Conditions were not normal here, however, and it was not a failure of skill but at most an error in judgment under abnormal circumstances which was charged against the captain. Whether or not his action, or failure of action, was undertaken *in extremis*, see The Oregon, 158 U.S. 186, 204, 15 S.Ct. 804, 39 L.Ed. 943 (1895), the context of his decision was that of an emergency, as the trial court recognized: "At least from the time of mooring the tow at Pier 9, it was obvious that the crane was in serious trouble and would capsize and sink if something were not done." By 9:35 p.m. the stern was awash, the vertical position of the crane boom could not be altered because the boom was locked in place and the ability of the barge to remain upright by itself even at that time was questionable, for by 11:15 it had become obvious that for some time the barge had been prevented from capsizing only by the lines fastening it to

the tug. We conclude that these facts present a situation of sufficient peril and immediacy to require application of a standard of law different from the standard of ordinary maritime negligence relied upon by the trial court. The question of negligence must be resolved in light of the circumstances, and "when faced with an emergency, negligence does not flow from mere errors in judgment." The S.S. Bellatrix, 114 F.2d 1004, 1007 (3rd Cir. 1940); accord The Imoan, 67 F.2d 603, 605 (2d Cir. 1933); The Hercules, *supra*. The standard of judging the exercise of prudent seamanship here was tempered by the requirement for decision under very difficult, abnormal circumstances and the error, if there was error, was not negligence.

We, therefore, reverse upon the law and the facts the conclusion of the trial court that the conduct of the captain and crew of the Michael Moran was the proximate cause of the capsizing of the floating crane Howlett No. 6.

FRIENDLY, Circuit Judge (dissenting).

After the Howlett No. 6 was berthed at her pier at Weehawken on a clear summer night with a gentle wind, Captain Morrissey, his engineer and his deck-hand had a period of two hours to do something to help her. While the testimony was unclear, Judge Cannella was justified in concluding that only a small portion of that time was consumed in the appropriate but unsuccessful attempt to accomplish pumping. The idea that the crew acted reasonably thereafter in confining their efforts to notifying their dispatcher and ringing a telephone with a constant busy signal was too much for the judge's rugged common sense. Even if we should think differently, as I do not, I perceive no sufficient basis for substituting our judgment for his.

Although this court has long held that a conclusion of negligence by a judge is not a "finding of fact" within the protection of F.R.Civ.P. 52(a), we have said that "it will ordinarily stand unless the lower court manifests an incorrect con-

**624**

ception of the applicable law." Cleary v. United States Lines Co., 411 F.2d 1009, 1010 (2 Cir. 1969). Our ruling in Esso Standard Oil, S. A. v. S. S. Gasbras Sul, 387 F.2d 573, 582 (2 Cir.), cert. denied, 391 U.S. 914, 88 S.Ct. 1808, 20 L.Ed.2d 653 (1968), is not to the contrary; we held that the judge *had* applied a wrong conception, namely, by viewing the master's actions in light of hindsight. The judge here fully recognized his duty in this regard.

The testimony of the two tugboat captains, both intimately familiar with these waters, was that beaching was an idea that would have occurred to a reasonable master as soon as it became evident that pumping would not succeed. The judge's questioning made it clear that all work on the stern manhole cover was over by around 9:35 P.M., and Morrissey's first bout with the telephone had concluded by 10 P.M., more than an hour before the debacle. The case is not as if the tug personnel had chosen between beaching and pumping, the latter choice had proved unsuccessful, and they were sought to be held liable for making it. Neither is it like one where they considered beaching and rejected it as impractical. Captain Morrissey admitted that he gave no thought to beaching at all. Despite the majority's contrary statement, the trial court did not regard the captain as having been confronted with an emergency in which the failure to consider a possible course of action might be excusable; it specifically found there was time for deliberation. To be sure a negligent failure to decide to beach would not support a recovery unless Howlett sustained its burden of showing that the effort would have succeeded. But this surely is a question of fact and I see no basis for deeming clearly erroneous the finding that this could probably have been accomplished if Morrissey had tried it around 10 P.M.

By second-guessing the district judge in a case like this, we encourage appeals on what are largely factual issues, thus needlessly produce further work for ourselves, and impair the confidence which the district courts deserve. See C. Wright, The Doubtful Omniscience of Appellate Courts, 41 Minn.L.Rev. 751, 778–82 (1957). I would therefore affirm the judgment. However, if it is decided to reverse, I see no justification whatever for attempting, as the majority apparently would do, to foreclose Judge Cannella's consideration of other claims of imprudent seamanship on which he found it unnecessary to pass; he particularly noted that it was "difficult to believe that the deckhand and the engineer were unable to remove the [stern manhole] cover with the power tools available."