**ESSO STANDARD OIL, S.A., Libelant,**

**v.**

**S.S. GASBRAS SUL, her engines, boilers, etc. and against A/S Sobral, as owner of the S.S. Gasbras Sul, Claimant-Respondent.**

United States District Court
S. D. New York.
July 10, 1964.

Kirlin, Campbell & Keating, New York City, for libelant; Walter P. Hickey, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for claimant-respondent; Gordon W. Paulsen, New York City, of counsel.

FEINBERG, District Judge.

This is a libel by Esso Standard Oil, S. A., a Panamanian corporation, in rem against the S.S. Gasbras Sul, and in personam against her owner, a Norwegian corporation. Esso seeks recovery for damages allegedly caused by a collision on September 17, 1955, between the S.S. Gasbras Sul and libelant's underwater petroleum discharging installation, or "sea terminal," located off the coast of Guatemala near San Jose. Both parties agree that since the collision occurred in Guatemalan territorial waters, the liability of respondent is governed by the

law of Guatemala. I hold, for the reasons stated below, that the master of the S.S. Gasbras Sul was negligent in the management and operation of the vessel and that respondent is, therefore, liable in full for the damage caused to libelant's underwater installation.[1]

# I

Libelant's sea terminal is used for unloading petroleum products from vessels anchored offshore. At the time of the damage complained of, the installation consisted of four parallel submarine pipelines of heavy gauge steel extending southward from the shore into the sea. The most easterly pipeline was twelve inches in diameter; the next was ten inches in diameter; and the third and fourth lines were four inches in diameter. Each pipe was ten to twenty feet from its neighbor and rested unsupported on the bottom of the sea.

The twelve inch line, which extended 2,175 feet into the ocean, was the longest, and carried fuel oil, asphalt and other so-called "dirty" products. The ten inch line was about 2,060 feet in length and carried "clean" products, such as aviation gasoline and diesel oil; the last 160 feet of this line was bent at about a twenty-five degree angle away from the twelve inch line. The two four inch lines were each about 1,900 feet long and carried liquid and vapor propane respectively. A specially reinforced rubber hose, 150 feet long, was connected to the seaward end of each pipeline, and consisted of five thirty-foot sections connected to each other and to the pipeline by welded flanges. The twelve inch and ten inch pipelines each had a ten inch hose. The four inch lines were each attached to four inch hoses. None of the pipelines was anchored.

There was a marker buoy—a steel cylinder six feet long and fourteen inches in diameter—attached by a three-quarter inch chain, sixty-four feet long, to the seaward end of the twelve inch pipeline, another to the ten inch line, and a third to a spreader between the two four inch pipes. At the seaward end of each hose there was attached a marker buoy by a similar chain.

Three steel cylindrical mooring buoys—each about ten feet in diameter and fifteen feet long—floated on the surface. Each mooring buoy was attached to a five ton anchor by means of a two and one-half inch chain 270 feet long, and was equipped with a hook in the shape of a fish hook to receive and hold stern mooring lines from vessels unloading at the sea terminal. Neither the mooring buoys nor the marker buoys were equipped with lights.

In discharging its cargo, the procedure to be followed by a ship is to moor at a ninety-degree angle to the shoreline, with its stern shoreward and its midships, where its manifold is located, at the hose ends. The hose ends are taken aboard by means of the ship's hoisting gear and connected to the ship's manifold through which the petroleum products are discharged by air compressors on board. The ship must use both bow anchors and secure its stern with two or three lines to each of the three stern mooring buoys—one directly astern, and one off each quarter—with the assistance of a launch standing by to carry the lines out to the buoys.

The S.S. Gasbras Sul originally had been built as a dry-cargo ship, but was converted to a propane carrier, 2,490 gross tons, with an overall length of 325 feet, a beam of forty-seven feet and a summer draft of twenty feet eight inches. In converting the ship, propane gas tanks were installed in the vessel's forward and after decks extending about twelve feet above the deck. The S.S. Gasbras Sul had been chartered to the Tropical Gas Company, the consignee of the cargo of liquified propane carried by the vessel.

At 5:20 P.M., on September 15, 1955, the S.S. Gasbras Sul arrived at the pier at San Jose, under the command of Captain Odd Dahle, but in view of the late hour and the risks attendant upon moor-

1. Issues relating to damages have been reserved by the pre-trial order for later disposition.

ing in the dark,[2] the captain decided to wait until the following day to proceed to the sea terminal, which is about one and one-half to two miles farther along the coast and lies unsheltered in the open roadstead. This was the fourth trip Captain Dahle had made to the sea terminal on the S.S. Gasbras Sul.[3]

At about 6:00 A.M. on the following morning, the vessel was boarded by Mr. Hermogenes Moreno, libelant's terminal superintendent at San Jose, and Mr. Arturo Bianchi Arguello, merchant manager for Tropical Gas, both of whom remained on board continuously until 10:00 A.M. the following day.[4] At this time, there were rain squalls and unusually heavy swells, but there was little wind or current,[5] and Captain Dahle proceeded to the unloading installation.

The S.S. Gasbras Sul was moored in accordance with the procedure outlined above, with two ropes to the buoy directly astern, three ropes to the starboard stern quarter buoy, and two ropes to the port stern quarter buoy.[6] While the vessel was mooring up, the weather was "worsening a little"; [7] the rain had become heavier, and the wind was blowing up.[8] Captain Dahle therefore delayed operations for about an hour until the weather improved.[9] The hoses from the four inch lines were then connected to the ship's manifold, and discharge of cargo was commenced at 12:05 P.M.,[10] at which time there was a gentle to moderate breeze from the east (seven to sixteen knots on the Beaufort Scale), the temperature was seventy-two degrees, the barometer 750 and it was raining.[11]

During the day, while the ship was discharging its cargo, the weather grew progressively worse; [12] the rain continued, the wind was blowing up intermittently and the swells were becoming increasingly heavy.[13] By 5:00 P.M., the captain realized that if he continued discharging, darkness would fall before the ship was ready to leave the sea terminal.[14] He testified that he had been concerned all day about the weather conditions,[15] and that he had considered the possibility of unmooring before darkness fell and returning the next day to complete discharging.[16] However, Moreno and Arguello, had told him that the weather conditions were usual for that time of the year, and that it might continue like that for a week.[17] The captain apparently thought that the weather would hold up sufficiently, and he decided to finish unloading with the expectation that he would still be able to leave the sea terminal that night with the assistance of a launch that was standing by to unhook the ship's lines from the mooring buoys.[18]

Captain Dahle testified that he had obtained a hurricane forecast for the Caribbean, but that the only report for waters in the area of San Jose came from Washington, and there was "nothing especi-

2. Transcript of Trial [hereinafter cited as "Tr."], p. 152.

3. Tr. pp. 194, 198, 205, 207.

4. Respondents' Exhibit [hereinafter cited as "Resp. Ex."], I–1, p. 3.

5. Tr. pp. 39, 159, 217; Resp. Ex. G–1, p. 1.

6. Tr. p. 156.

7. Tr. p. 218.

8. Tr. p. 162; Resp. Ex. G–1, pp. 1–2.

9. Tr. p. 162.

10. Resp. Ex. I–1, p. 2.

11. Resp. Ex. I–1, p. 3.

12. Tr. p. 232.

13. Tr. p. 163.

14. Tr. pp. 230–31. Darkness had fallen the previous day at about 6:30.

15. Tr. pp. 234–35. The testimony of Captain Dahle was taken by deposition in Norfolk, Virginia, on February 1, 1962, and was read into the record at the trial. Tr. pp. 146–249.

16. Tr. p. 232.

17. Tr. p. 235.

18. Tr. p. 233. Captain Dahle testified that on previous occasions, he had left the sea terminal "in the middle of the night," using the same procedure that he would use during the day. Tr. pp. 165–66.

ally" reported for the coast.[19] However, the captain did have some knowledge of the weather conditions for the area during that time of the year. On a previous occasion, when Captain Dahle had first moored a vessel at the San Jose sea terminal, Captain Jensen, the mooring master employed by libelant at its sea terminal, acquainted Captain Dahle with seasonal weather conditions and the characteristics of sea mooring at San Jose,[20] and particularly warned him against staying in the sea mooring overnight during the rainy season.[21] Captain Jensen specifically informed Captain Dahle that during the rainy season, which runs from May to the end of October, violent local storms, called "chubascos," frequently arise with little or no warning and strike between the hours of 6:00 P.M. and 6:00 A.M., from the east through east-north-east and northeast with wind velocities ranging from twenty to sixty miles an hour.[22] Captain Jensen also advised Captain Dahle that he should leave the mooring facilities as soon as he had completed discharge, but that if the weather got bad—for example, if there were particularly strong winds or seas—he should stop the discharge, disconnect the hoses and, if necessary, leave the terminal.[23]

By 6:00 or 7:00 P.M. on the evening of September 16, the weather conditions were worse than they had been all day,[24] and Captain Dahle ordered his crew to complete discharging and disconnect the hoses as quickly as possible, because he still contemplated leaving the terminal after the discharging was completed.[25] At 8:00 P.M., according to the vessel's log, the wind had shifted from east to east-southeast and had increased to a fresh breeze (seventeen to twenty-one knots). The temperature was seventy-one degrees, and the barometer was 749.[26] By the time the hoses were disconnected, at 9:30 P.M., the weather conditions were "very bad"; the wind was much stronger, the sea was rougher, and a very heavy rain was falling.[27] Captain Dahle believed at this time that it was too dangerous for the ship to leave the sea terminal, and he decided to remain until daylight.[28] Messrs. Moreno and Arguello, as well as the chief officer, concurred in this decision.[29]

At about 3:00 A.M. on the morning of September 17, a severe chubasco struck.[30] The ship began drifting in towards the beach, dragging both anchors. In an effort to maneuver the vessel away from the beach and out to sea, the mooring lines were cut loose, the engines were started, and the vessel began weighing anchors.[31] At 3:30, the starboard anchor was up,[32] but the vessel continued to drift

19. Tr. pp. 218–19. Although there was a walkie-talkie aboard, the Captain testified that he did not use it to obtain weather information from shoreside because he did not know whom to contact. Tr. p. 235. The ship's radar was on at all times after mooring, but did not give warning of any approaching storm. Tr. pp. 246, 265. The ship's barometer did not indicate a storm until early the following morning. Resp. Ex. I–1.

20. Tr. pp. 187, 342–43, 384.

21. Tr. p. 386.

22. Tr. pp. 342–44; see Tr. pp. 181–82, 246–47. Captain Jensen testified that he also warned Captain Dahle of another type of storm that comes up from the southeast and lasts from two to three days. Tr. p. 343.

The Sailing Directions for the coast of Guatemala state that "southerly and south-southeasterly winds, accompanied by heavy squalls and frequent rains, prevail from July to October"; that " 'Chubascos' * * * are frequent at night from the middle of May until October"; that they "occur without warning," and that "vessels have dragged anchor at such times." Libelant's Exhibit [hereinafter cited as "Lib. Ex."] 9.

23. Tr. pp. 384–87.

24. Tr. pp. 231, 237–38.

25. Tr. p. 231.

26. Resp. Ex. I–1, p. 3.

27. Tr. pp. 164–65; Resp. Ex. G–1, p. 2.

28. Tr. pp. 165–67; Resp. Ex. G–1, pp. 2–3.

29. Tr. pp. 167–68, 284–86.

30. Tr. p. 63.

31. Tr. pp. 251–56.

32. Resp. Ex. I–1, p. 3.

towards shore, dragging its port anchor.[33] The ship's second officer then noticed a mooring buoy or a marking buoy under the stern, and a few minutes later the chief engineer called up from the engine room that something was caught in the propeller and that he could not get the engine started again.[34] The Captain testified that he did not know exactly what it was that had fouled the propeller, but he thought that it was probably a buoy or a chain from one of the buoys.[35] The ship then dropped its starboard anchor, the propeller was cleared, and both anchors were weighed.[36] The vessel then proceeded out to sea where it remained until about 7:15 A.M. when the weather improved.[37] The S.S. Gasbras Sul subsequently returned to the sea terminal, retrieved some of her mooring lines, finished unloading and finally departed later that day.[38]

A survey and inspection subsequently conducted by libelant revealed that the marker buoys that had marked the ends of the ten inch and twelve inch pipelines were missing and that another was out of place;[39] that about 680 feet of the ten inch pipeline had been turned back on itself and damaged beyond repair;[40] and that four of the five sections of the hose connected to the ten inch pipeline had been flattened out of shape.[41] The ten inch pipeline was abandoned and replaced in March of the following year.[42]

## II

Libelant Esso contends that the damage to its sea terminal at San Jose was proximately caused by the negligent operation of the S.S. Gasbras Sul and was not caused by any negligence on its part. It urges that under Guatemalan law, a ship is liable for any damages proximately caused by its negligence and that, in any event, under the Accidents Law of Guatemala, a ship is liable without regard to fault.

Respondents deny that there was any negligence in the operation of the S.S. Gasbras Sul. They also contend that the design and maintenance of libelant's sea terminal at San Jose was faulty, that this contributed to the accident, and that, therefore, if respondents are found to have been negligent, each party is required to bear its own loss under the law of Guatemala. Finally, respondents deny that there is any principle of absolute liability under Guatemalan law.

The general federal rule is that the law of a foreign country is a fact which must be proved. Black Diamond S.S. Corp. v. Robert Stewart & Sons, 336 U.S. 386, 396–397, 69 S.Ct. 622, 93 L.Ed. 754 (1949); Walton v. Arabian American Oil Co., 233 F.2d 541, 543 (2 Cir.), cert. denied, 352 U.S. 872, 77 S.Ct. 97, 1 L.E.2d 77 (1956). To that end, the proctors for libelant and respondents each called an expert witness at the trial and introduced into evidence photostatic copies of certain legislative decrees contained in the Official Compilation of the Laws of Guatemala and of certain provisions of the Commercial Code of Guatemala, a copy of the Civil Code of Guatemala, translations of relevant provisions in the decrees and the Codes and of certain decisions of the Supreme Court of Guatemala, as to all of which the witnesses testified at the trial.

Out of the welter of confusing and often contradictory testimony and exhibits, there are a few clear and undisputed facts about Guatemalan law. Under the law of Guatemala, negligence—in the same sense that the concept is used in Anglo-American law—is a basis for liability if that negligence proximately

33. Tr. pp. 256, 260.

34. Tr. pp. 175–76.

35. Tr. pp. 176–77, 259, 262–63, 305. See Resp. Ex. I–1, p. 3.

36. Resp. Ex. I–1, p. 3.

37. Ibid.

38. Resp. Ex. I–1, p. 4.

39. Tr. pp. 77–78.

40. Tr. pp. 19–25; Resp. Ex. F.

41. Resp. Ex. F.

42. Tr. p. 25.

causes a collision between a vessel and a stationary object, which results in damage [43] and a shipowner is responsible for the negligence of its captain.[44] There is controversy between the parties as to other aspects of Guatemalan law—whether there is absolute liability for damages caused by a ship, whether the ship captain here is held to a standard short of absolute liability but higher than ordinary negligence, whether a collision resulting from negligence of both parties leaves the damages where they fall. However, it is not necessary to deal with these problems since I find that the damage to libelant's sea terminal was due solely to the ordinary negligence of the operation of the S.S. Gasbras Sul by its captain.

On the basis of the facts found above, I hold that the decision of Captain Dahle to stay in the sea terminal overnight was negligent under the circumstances and that this negligence was the proximate cause of libelant's damages.[45] Three instances of faulty judgment clearly emerge from the evidence, any one of which justifies this finding. By 5:00 P.M., it was reasonably clear that the weather was not improving and was, in fact, worsening. The usual time between completion of discharging and placing the marker buoys back into the water was approximately one and one-half hours [46] and darkness had fallen about 6:30 or 7:00 P.M. the previous day.[47] Therefore, about 5:00 P.M. was the latest time for Captain Dahle to stop discharging if departure from the sea terminal was to be accomplished before darkness fell.[48] The chief reason given by Captain Dahle for not leaving the sea terminal at 9:30,

when discharging and disconnecting was actually completed, was that darkness made departure too dangerous in light of the then prevailing weather.[49] Although it is true that the weather worsened from 5:00 P.M. to 9:30 P.M., nevertheless the danger attendant upon darkness would have been eliminated had discharging been stopped at about 5:00 P.M. Captain Dahle had been warned not to stay at the sea terminal overnight in view of the likelihood of chubascos, even if this meant stopping the unloading process before completion; the weather was clearly not improving, and the reasonable course would have been to get out to sea before darkness fell.

It was similarly negligent for Captain Dahle to continue discharging cargo, rather than commence to leave the sea terminal, when the weather took an even clearer turn for the worse at about 6:00 or 7:00 P.M. While it is true that cessation of unloading at that time would not have enabled the S.S. Gasbras Sul to leave the sea terminal in daylight (since departure would have been made after sundown), immediate and emergency action would have accomplished departure well before 9:30, perhaps by as much as one hour or one and one-half hours. The condition of the weather between 6:00 and 9:30 P.M. indicates that it would have been safer to leave at 8:00 or 8:30, rather than at 9:30, when Captain Dahle finally did make up his mind as to what course to take.[50] Finally, even the decision not to leave at 9:30 was, under the circumstances, unreasonable. While it was true there were risks to unmooring and leaving in the darkness, the risks could have been appreciably lessened by

43. Codigo Civil de la Republica de Guatemala, arts. 2276, 2277, 1435, 1436. Lib. Exs. 15, 16, 15A (transl.). Tr. pp. 617–18.

44. Codigo de Comercio de la Republica de Guatemala, art. 86. Lib. Ex. 17.

45. Cf. The Havana, 89 F.2d 23 (2 Cir. 1937); The Charles H. Sells, 89 F.2d 631 (2 Cir. 1937).

46. Tr. p. 236. This time estimate included blowing the pipelines clear, disconnect-

ing the hoses, and dropping the marker buoys.

47. Tr. p. 230.

48. This assumes that only a small amount of time would be required for letting go of the moorings. If necessary, the mooring lines could have been cut.

49. Tr. pp. 165, 169.

50. Tr. pp. 164–67.

cutting the lines instead of having men unmoor them. As indicated above, Captain Dahle had been specifically advised before of the danger of staying in the vicinity of the sea terminal in the chubasco season, and the weather was obviously worsening. The reasonable course would have been to get out to sea as quickly as possible, where the vessel would have been safer.[51] Had this been done, the sea terminal would not have been damaged.[52]

Respondents also urge that leaving the sea terminal, particularly in the dark, raised the danger of fouling the propeller or the rudder with the mooring lines or the chains on the marker buoys. While there undoubtedly were risks attendant on leaving, in daylight or in the dark, I conclude on the evidence before me that reasonable seamanship could have successfully accomplished departure. Respondents also rely upon a decision involving damage to libelant's sea terminal more than a year earlier when another vessel dragged her anchor during violent storms. Esso Standard Oil, S.A. v. The S.S. Sabrina, 154 F.Supp. 720 (D. Canal Zone 1957). In the portion of the case relied upon by respondents, the court held that the ship was not liable for damage to a pipeline that occurred during the second of three "chubascos." However, respondents' reliance is misplaced since the basis of the court's holding was that regardless of the alleged negligence of the vessel's captain, the vessel would still have been at its berth discharging when the second "chubasco" struck. Moreover, it does not appear from the opinion

that the issue of whether the vessel was negligent in remaining at the sea terminal overnight was raised by the parties or considered by the court.

Respondents also argue that, in any event, the design and maintenance of libelant's sea terminal was faulty in various respects,[53] that this amounted to negligence on libelant's part which, at the very least, contributed to the accident and, therefore, each party is required to bear its own loss. However, the evidence does not justify the conclusion that libelant was negligent in designing and maintaining the sea terminal. The expert witnesses who testified on this point differed and, while there may be other sea terminals in existence with improved features for larger tankers,[54] I am not persuaded that libelant's terminal and equipment in the area in which it was located failed to meet reasonable standards of safety. Finally, it is true that libelant's mooring master was not available on September 16 and 17, because he was admittedly elsewhere on business,[55] but, under the circumstances of this case, this did not constitute negligence in the maintenance of the sea terminal. Nor did the absence of libelant's mooring master entitle the captain of the S.S. Gasbras Sul to rely on the advice of Moreno, libelant's terminal superintendent. Responsibility for navigation of the ship rested solely on the captain. See Esso Standard Oil, S.A., supra at 724.

Accordingly, I find that libelant has met its burden of proving that the damage to its sea terminal on September 17,

---

51. Tr. p. 239.

52. Respondents rely on the defense of "Act of God" or "inevitable accident." While there is some conflict in the expert testimony as to whether the law of Guatemala recognizes this defense, compare Tr. p. 698 with Tr. p. 643, it is unnecessary to determine this question since, in any event, the defense applies only to those situations in which the accident would have occurred even if all precautions reasonably to be required had been taken. "To say there is no liability in such a case seems only another way of saying that liability must

be based on fault." Gilmore and Black, Admiralty 396–97 (1957). My finding that the accident would not have occurred if Captain Dahle had exercised reasonable care therefore precludes reliance on "inevitable accident."

53. E.g., respondents argue that the mooring buoys did not have self-releasing hooks, that the buoys should have been spar buoys and should have been lighted and that the pipelines were not anchored.

54. See Tr. pp. 521–40, 546.

55. Tr. pp. 388–89.

1955, was proximately caused by respondents' negligence; that libelant was not negligent; and that respondents are liable to libelant for the damage so caused. The foregoing opinion shall constitute the findings of fact and conclusions of law of the Court. Submit decree on notice.