387 F.2d 573
 ESSO STANDARD OIL S.A., Plaintiff-Appellee,
v.
The S. S. GASBRAS SUL, her engines, boilers, etc., and A/S
Sobral, as Owner ofthe S. S. Gasbras Sul,
Claimant-Defendant-Appellant.
 No. 65, Docket 31251.
 United States Court of Appeals Second Circuit.
 Argued Oct. 4, 1967.
Decided Nov. 29, 1967, Rehearing Denied Jan. 4, 1968.
 
 Richard G. Ashworth, New York City (Gordon W. Paulsen, and Haight, Gardner, Poor & Havens, New York City, on the brief), for claimant-defendant-appellant.
 Walter P. Hickey, Charles N. Fiddler, New York City (Kenneth R. Arnold, Thomas J. Romans, and Kirlin, Campbell & Keating, New York City, on the brief), for plaintiff-appellee.
 Before FRIENDLY, HAYS and ANDERSON, Circuit Judges.
 ANDERSON, Circuit Judge:
 
 
 1
 The SS. Gasbras Sul, sailing under the flag of Norway and owned by A/S Sobral, a Norwegian corporation, arrived at San Jose, Guatemala during the evening of September 15, 1955. Originally built as a dry-cargo carrier, she had been converted to a propane carrier by the installation of tanks, both forward and aft, which projected twelve feet above the deck. The vessel was 325 feet long with a beam of 47 feet and a summer draft of 20 feet 8 inches.
 
 
 2
 She had been chartered by Tropical Gas Company, the consignee of a cargo of liquid propane which was to be delivered at the sea terminal of the plaintiff-appellee, Esso Standard Oil S.A., a Panamanian corporation, at San Jose. The sea terminal consisted of a group of storage tanks ashore, to which were connected four pipelines which ran out into the sea in a southerly direction at right angles to the shoreline, which ran east and west. The four pipelines had varying lengths and diameters: a twelve-inch line extended out 2175 feet; a ten-inch line, 2060 feet; and the two four-inch lines ran out 1900 feet. One of the four-inch lines was used to carry vapor propane and the other liquid propane. At the outer end of each pipeline there was attached a re-inforced rubber hose, 150 feet long, designed to be picked up by a ship and connected with the outlet from the ship's tanks.
 
 
 3
 There were marker buoys at the seaward ends of both the twelve-inch and ten-inch pipelines and one marking the end of the two four-inch pipelines. There were also marker buoys at the ends of the hoses attached to the pipelines. Between these marker buoys and the shore there were three large mooring buoys, so located that a tanker, with the marker buoys abeam at amidships, could make fact to the mooring buoys with her stern lines. These two four-inch pipelines and the tanks to which they were connected on the shore were leased by Esso to Tropical Gas Company.
 
 
 4
 Early in the morning of September 16, 1955 Moreno, Esso's terminal superintendent, and Arguello, manager for Tropical Gas, boarded the Gasbras Sul. Shortly thereafter the vessel moved to the discharging berth at the sea terminal. She was moored port side to the pipelines with her starboard and port anchors, each about 45 degrees off of the bow and each on ninety fathoms of chain. Stern lines ran to the three mooring buoys; three lines off the starboard quarter, two from the stern and two from the port quarter. All of the lines were new except one, partly used, which was still in good condition.
 
 
 5
 Mooring was completed at 0820 but further procedures were delayed for an hour because of heavy rain squalls. The taking up and securing of the hose from the four-inch liquid propane pipeline, the coupling of the connections with the outlets from the tanks, and other preliminary measures were accomplished by 1205, when discharging of the propane began. This continued until 2005 when the shore tanks were filled and the operation of disconnecting the hose began. This was fully accomplished by 2130 and the hose was let go. The Master of the vessel had intended to put out to sea at that time but because of the deterioration of the weather he decided it would be safer to remain where he was.
 
 
 6
 The evidence showed that at that time of year the prevailing weather at San Jose is characterized by southerly and south-southeasterly winds accompanied by heavy squalls and frequent rains. When the Gasbras Sul was moored at the sea terminal about noon of September 16th, the wind was east, Force 3-4, i.e. gentle to moderate, or 7 to 16 knots, the barometer stood at 750 millimeters and it was raining. The current was setting from west to east at a rate slightly over a knot, and there were swells from the south. Darkness fell between 1830 and 1900, somewhat intensified by clouds and rain. The Master described the weather as 'up and down' all afternoon. The gentle-moderate wind had continued but the swells had gradually increased. Between 1800 and 1900 the weather became a little worse and by 2000 the wind had picked up to force 5, i.e. 17-21 knots, and had commenced to veer toward the southeast. It was also showery. The swells continued to increase but the barometer had dropped only one millimeter to 749. By the time the discharging operation had been completed and the hose was let go at 2130, the combination of wind and current and the increased swells were causing the vessel to yaw badly. A torrential rain had reduced visibility almost to zero. Under these circumstances the Master would have chosen to slip his moorings, take up his anchors and stand out to sea. What prevented him from doing so was the presence of the seven marker buoys and their chains, which were unlighted; one might be seen occasionally but only by chance. Some were heavy in the water from barnacles and the weight of the chains, and they rode so low in the water and were so poorly painted that they were hard to see. They could not be picked-up by flashlight beams which reflected back in the heavy rain.
 
 
 7
 The Captain of the Gasbras Sul was faced with a very difficult decision. The vessel had liquid propane left in some of the tanks and was less than half a mile from a lea shore. If, on the one hand, he decided to leave the mooring, he faced the very grave risk of fouling the buoys in getting under weigh, with a good chance of broaching to, followed by the beaching of the vessel, and her destruction by explosion. On the other hand, if he remained at the mooring, there was the possibility that he might be struck by a 'Chubasco,' a local, heavy squall which from May to October occurs frequently at night; it blows at anywhere from 20 to 60 knots from the east, accompanied by heavy rain, and lasts about 45 minutes. The Master decided that in view of the fact that he was well moored, with anchors holding and with ample scope, it was less dangerous to remain where he was than it was to attempt to leave.
 
 
 8
 The Gasbras Sul continued at her mooring without difficulty and without incident during the remainder of September 16th. At 0100, September 17th, the wind was southeast and at 0200 its velocity went down to Force 4. The sea was at Force 5, i.e. waves of eight to twelve feet from trough to crest. During the last two or three hours of September 16 and the first two and a half hours of the 17th the evidence indicates that there was no significant change in the progression of rain squalls, with possibly brief lulls in between. The combination of heavy swells and seas and the extremely limited visibility made it still hazardous to attempt to leave the mooring. Between 0230 and 0300, however, the Chubasco struck. The wind veered to the south; it increased to Force 6 (22-27 knots) and continued to rise. The swells were large and the seas were turbulent. There was practically no visibility because the rain was so heavy. The barometer had started to drop at about 0230 and at 0300 stood at 744 millimeters. During this time the anchors began to drag. Captain Dahle immediately ordered the stern lines to be cut or let go through the chocks. When this had been done, he ordered the Chief Officer to take in the anchors. Some of the crew were stationed around the rail to try to locate buoys which occasionally showed up, sometimes on one side of the ship and sometimes on the other. The Captain had ordered the engines ahead at speeds called for by the changing circumstances, but stopped the propeller whenever there appeared to be imminent danger of fouling a buoy. Just after the starboard anchor had been broken out, and was 'up and down,' something[1] fouled the propeller and prevented it from turning. The Captain ordered the starboard anchor dropped under foot and both anchors let out. The vessel, which meanwhile had swung off before the wind and sea, headed up. The engineer by alternately backing and going ahead on the engine cleared the propeller. By this time the stern of the vessel was almost into shoal water and the surf. The Captain, during a lull in the down-pour saw just off the port quarter a red buoy which marked the line of breakers. With the propulsion restored the anchors were taken in and at 0400 the Gasbras Sul with all engines ahead at full speed put out to sea where she rode out the storm and did not return to the roadstead until 0850 after the storm had abated. It was afterward discovered that in dragging her anchor the vessel caused damage to Esso's submarine pipeline and, based upon findings by a special master, the trial court awarded Esso $62,733.17. We conclude that the appellant was not liable and therefore reverse the judgment.
 
 
 9
 Captain Dahle had moored the Gasbras Sul at Esso's sea terminal and discharged a cargo of propane on three occasions prior to September 15-17; they were April 9, June 16 and August 3 of the same year, 1955. On April 10th, the day following arrival on the first trip, Esso's mooring master, Captain Jensen, went on board shortly after the Gasbras Sul had moored at the terminal and was preparing to discharge the cargo. He and Captain Dahle discussed mooring and unmooring and Captain Jensen told Captain Dahle about local and seasonal weather conditions. On June 16th Captain Jensen boarded the vessel before it went to the sea terminal, and he remained on board during the mooring operation. He again discussed mooring and unmooring procedures with Captain Dahle. Captain Jensen was not aboard during the visit of August 3rd and was not at San Jose September 16th-17th. In his discussions with Captain Dahle about the weather, Jensen told him of the dry and rainy seasons, that the latter starts in May and ends in October; that during the rainy season there were often southeasterly storms that usually lasted two or three days; that there could also occur between 1800 of one day and 0600 of the next, during that season, local rain squalls, called 'Chubascos,' which have wind velocities from twenty to sixty miles per hour. Captain Jensen advised Captain Dahle that when there were very bad conditions of winds, seas or currents it would be best not to moor, but if the vessel was already moored and discharging, and conditions of sea or weather became so bad that it endangered the ship he should stop discharging, drop the hose, and leave the terminal. He also advised Captain Dahle to leave the terminal in any event once he had completed discharging.
 
 
 10
 The trial court concluded that the appellant had been negligent in the management and operation of the vessel on three separate occasions, that any and all of these acts of negligence proximately caused the damage to appellee's underwater pipeline and that the appellant was therefore liable. The negligence found consisted of the exercise of faulty judgment on the part of Captain Dahle in not discontinuing discharging operations and leaving the terminal for the open sea on September 16 at or about 1700, also between 1800 and 1900 and after discharging had been completed at 2130. The trial court found: 'The chief reason given by Captain Dahle for not leaving the sea terminal at 9:30 P.M., when discharging and disconnecting was actually completed, was that darkness made departure too dangerous in the light of the then prevailing weather. Although it is true that the weather worsened from 5:00 P.M. to 9:30 P.M., nevertheless the danger attendant upon darkness would have been eliminated had discharging been stopped at about 5:00 P.M.' While this is so in retrospect, Captain Dahle did not know at 1700 or at 1800, 1900 or 2000 what the weather and sea conditions would be at 2130. Nor can it be said that he reasonably ought to have known. The weather was apparently typically erratic. There were no local weather reports or forecasts. Moreno and Arguello, though they were not seamen, were nevertheless very familiar with local weather conditions and patterns and they told Captain Dahle that the weather was likely to continue as it was for several days or a week. The Captain testified that it had been up and down all day. It was what usually prevailed at that season, with southeasterly winds, heavy squalls and frequent rains. The barometer at noon was at 750 millimeters; at about 1900 it had remained unchanged. The wind, which at noon was Force 3-4, gentle to moderate, and from the east, veered somewhat toward the southeast and gradually increased so that at 2000 it was blowing at Force 5, which was a fresh breeze. At that time the barometer read 749 millimeters. The swells from the south had gradually increased. Surely none of these things threatened any danger to a vessel of the size of the Gasbras Sul, nor did they appear to be a prelude to a Chubasco. The rain squalls were a weather disturbance separate and distinct from the Chubasco. The former came from the sea, southeast to south, and lasted for several days; the latter came from the land, from a northeasterly to an easterly direction, and lasted about 45 minutes.
 
 
 11
 The appellee places a great deal of stress upon the trial court's finding that Captain Jensen had Warned Captain Dahle not to remain at the sea terminal overnight if discharging of the cargo had not been completed before dark. Although Captain Jensen at one point said, in part, that he warned Captain Dahle 'against staying in the sea mooring overnight in the rainy season,' it becomes clear from the rest of his testimony as well as his own customary practice, that he did not mean that Dahle should never continue discharging cargo after dark, but that he shouldn't moor there overnight when there was no need for it, and that whenever Captain Dahle completed the discharge of his cargo after dark, he should leave the mooring. Captain Jensen nowhere suggests that he advised any master to attempt to leave the mooring under circumstances such as those faced by Captain Dahle at 2130 on September 16. As to conditions under which the discharging of cargo should be suspended and the vessel should leave the mooring Captain Jensen said 'Captain Dahle was to use his own judgment as a seaman if the weather was at worse and it is hard for his ship to lay in the terminal, and if he felt in his judgment that the weather would cause possible strain or damage to his ship.'
 
 
 12
 Moreover, the appellee, recognizing the hazards both to tankers and to the sea terminal inherent in the use of its installation, located as it was in an open roadstead where erratic weather patterns prevailed, provided the services of Captain Jensen, who was an experienced master of tankers and who had extensive knowledge of local conditions of current, sea and weather. He customarily approved and made a practice of continuing the discharging of cargoes through the night hours during the Chubasco season and had done so with a tanker the day before the Gasbras Sul used the terminal and also again at the end of September, and on its previous visits the Gasbras Sul had discharged at night with Captain Jensen's knowledge and approval.
 
 
 13
 Captain Dahle was aware at 1700 that the discharging operation could not be completed until after dark. He weighed all of the circumstances and considered whether to suspend the operation and leave the terminal. He discussed the matter with Chief Officer Olsen and it was their considered judgment that 'it was not so bad that we couldn't discharge the cargo and go out after finishing.' This was not a case of heedless disregard of conditions or of reckless taking of chances in plain view of imminent danger.
 
 
 14
 Likewise at 1800, 1900 and 2000, although there was a worsening of the weather and the swells, there was no evidence of conditions which showed a reasonable likelihood of damage to the ship or the installation, nor was there any sound reason to suppose that the discharging operation could not be successfully concluded, as it in fact was, or that the Gasbras Sul could not leave the mooring, after its task had been completed, and put to sea.
 
 
 15
 By 2130, when the hose was dropped, the weather conditions were very bad. Taking Captain Dahle's and Chief Officer Olsen's testimony and the other relevant evidence as a whole, it is quite clear that in spite of the state of the wind, sea and swells Captain Dahle could have and would have left the mooring except for the one overriding consideration which was that it was virtually impossible in the torrential downpour to see where the marker buoys were located because they were unlighted. To risk departing under those circumstances would have opened up the frightening prospect of becoming hung-up on one of the buoys or its chain, broaching the vessel and inviting her complete destruction with the lives of all on board. Captain Dahle was too good a seaman not to know that he could cut or slip his stern lines which he later actually did when the Chubasco came. The appellee argues that had he done so the stern of the vessel would have fallen off to starboard as she headed into the wind and would have remained clear of the marker buoys. But this was far from proven. The vessel was subject to the confluence of a number of forces: a southeast wind, which was generally veering in a southerly direction, heavy swells from the south, a current setting north with a drift of something just over a knot. She was pitching and rolling and could not be assumed to be lying steadily headed into the southeast wind. Her anchors had to be taken in. The appellee asserts that Captain Dahle should have taken in on both anchors at once until the vessel was well clear of the marker buoys and then have taken up the starboard anchor and the port, singly, in that order. If, however, consideration is given to the relative positions of the longest pipeline's marker buoys and those of the four-inch pipes, as well as the length and position of the vessel, and the location of each of the anchors with ninety fathoms of chain out, at 45 degrees off of the bow, there is no persuasive proof that the stern of the vessel could, under the adverse weather conditions have remained well clear of the outer buoys. They might have been cleared if both anchors were completely taken in at the same time, but if Captain Dahle had attempted to do that, once the chains were out less than three shots or shackles, there would have been grave danger that the Gasbras Sul would have fouled her own anchors.
 
 
 16
 Captain Dahle and his Chief Officer were there on the vessel; they were experienced and competent seamen; they were first hand observers of the state of the wind and the sea and the forces operating on the ship. They also knew the ship and how she was responding to those forces. After giving careful consideration to the situation, the Captain decided that the safer course was to remain at the mooring. He was not guilty of negligence in so deciding. There was nothing to indicate that early the next morning a Chubasco would follow hard on the heels of the southeasterly storm. He had a general warning from the United States Hydrographic Office Sailing Directions and also from Captain Jensen that Chubascos occurred frequently during the rainy season. But he was not advised and no evidence was ever offered as to whether or not a Chubasco was likely to follow a southeasterly storm, whether its force would under those circumstances be greater or less, or that it could come from the south-southeast and south rather than its usual direction from the northeast quadrant. Nor was Captain Dahle told that the coming of a Chubasco was so frequent that it was likely to come every night or the majority of nights or so often that discharging operations at the sea terminal had to be suspended every day before dark. In sum, no information was available and no warning was given Captain Dahle which would support the conclusion that he was negligent in failing to heed it.
 
 
 17
 When the Chubasco struck about 0230 to 0300 on the morning of September 17th and the Gasbras Sul began to drag her anchors, the vessel was in a perilous situation. Her doom was almost sealed when she ran afoul of a buoy which jammed in the stern and stopped her propeller. The Captain's prompt order to drop the starboard anchor under foot and the speedy execution of the order by the Chief Officer checked the bow from swinging further to port and brought it up to the wind; and the engineer's instantaneous action in alternately applying the power ahead and astern freed the propeller. The vessel was favored by a certain amount of good fortune but that alone would not have saved her. The measures taken to meet this sudden and grave crisis demonstrated a very high degree of professional skill and competency on the part of the Master and showed that the Gasbras Sul had well trained and well disciplined officers and men.
 
 
 18
 Captain Jensen was the best qualified expert produced by Esso. He had not only been a master of tankers operating in Central American waters, but as the mooring master for Esso at San Jose, he had a thorough knowledge of local conditions and the use of the sea terminal. Yet his testimony does not suggest that Captain Dahle used poor judgment or in any way displayed a lack of professional skill in his management and operation of the Gasbras Sul at San Jose on September 15-17, 1955, with the minor exception that in his opinion Captain Dahle should have used three mooring lines from the vessel's port quarter rather than two. Captain Dahle had used three lines from the starboard quarter as added protection against the vessel's moving against the marker buoys which were on the port hand. What Captain Jensen failed to consider, however, was that when Captain Dahle moored the vessel at the terminal the current was setting east and tending to carry the vessel toward the marker buoys, at a time when the east-southeast wind was gentle to moderate. In any event the propriety of placing two instead of three lines to the mooring buoy off of the port quarter had no effect on subsequent events.
 
 
 19
 We conclude that the appellee failed to meet its burden of proving negligence on the part of the appellant. We are satisfied that Captain Dahle did not act in disregard of reasonable prudence and due care but exercised his professional skill and considered judgment in the light of the circumstances existing and reasonably foreseeable at each of the times in question.
 
 
 20
 Whether the facts constitute negligence is not subject to the clearly erroneous rule and this court reviews the trial court's decision on that issue as a question of law. Mamiye Bros. v. Barber Steamship Lines, Inc., 360 F.2d 774, 776 (2 Cir.) cert. denied 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966); Ellerman Lines, Limited v. The President Harding, 288 F.2d 288, 291-292 (2 Cir. 1961); Romero v. Garcia & Giaz, Inc., 286 F.2d 347, 355-56 (2 Cir.) cert. denied, 365 U.S. 869, 81 S.Ct. 905, 5 L.Ed.2d 860 (1961); Skibs A/S Dalfonn v. S/T Alabama, 373 F.2d 101, 106 (2 Cir. 1967).
 
 
 21
 We have also said that the trial court's 'finding should ordinarily stand unless the court manifests an incorrect conception of the applicable law.' Radovich v. Cunard Steamship Co., 364 F.2d 149, 152 (2 Cir. 1966).
 
 
 22
 Here the trial court erred in not passing upon each of what it considered Captain Dahle's three mistakes in judgment, i.e. in deciding not to leave the mooring at 1700, at 1800-1900 and at 2130, in the light of circumstances known at each of those times and what was reasonably foreseeable at each of those times. By viewing each occasion retrospectively in the light of all that occurred through the morning of the next day, it imposed upon Captain Dahle a duty to foresee future happenings which were mere possibilities and of which there was, at the time he exercised his judgment, no evidence.[2] The master of a vessel caught in an emergency where he is forced to choose between risky alternatives, is entitled to a wide range of discretion in deciding what to do, provided it is a reasonable exercise of current standards of nautical knowledge and skill under the circumstances. It does not become negligence because the decision he makes may later, in the light of subsequent events revealed through hindsight, be shown to have been wrong. The Mohegan,28 F.2d 795, 796 (2 Cir. 1928); Farrell Lines, Inc. v. The S/S Birkenstein,207 F.Supp. 500, 509 (S.D.N.Y.1962); Olsen v. Luckenback, 238 F. 237, 240 (S.D.N.Y.1916).
 
 
 23
 The appellee asserts that even if the appellant is held not to have been negligent, the vessel and owner should be responsible for the damage to the pipeline and hose because by statute,[3] Guatemalan law, which applies, provides for liability without fault-- an issue which on its view the district court was not required to determine. Esso bears the burden of persuasion on this but has not sustained it. Apart from doubt whether the legislation creates a regime of strict liability, as Esso contends, or merely relieves persons suing transportation companies from having to show an agency relationship with 'the persons entrusted with the vehicles,' the preambles to the 1945 amendment imply that the legislation operates only in favor of users of the service. No case has been cited to us in which other persons have been permitted to recover without a showing of fault. The testimony of the experts is, as so often, in diametric opposition, and we see no basis for crediting libellant's expert as against respondent's.
 
 
 24
 The judgment below is reversed and the libel is dismissed with costs.
 
 Petition for Rehearing
 
 25
 The plaintiff-appellee has petitioned for rehearing on two grounds: the first is that this court did not apply the amended Rule 44.1 F.R.Civ.P. which made the court's determination of applicable law of a foreign country a ruling on a question of law rather than an issue of fact, as it was prior to July 1, 1966; and the second is that this court was wrong in overruling the trial court's conclusion that the Master of the Gasbras Sul was negligent.
 
 
 26
 It should be noted that although the district court, as stated, was not ultimately required to render a conclusion as to the effect of any strict liability provision in Guatemalan law on the present case, it did find that the only clearly proven facts about Guatemalan law were that negligence, proximate cause and resulting damage followed the same concepts as those in Anglo-American law. Otherwise the proof of foreign law was a 'welter of confusing and often contradictory testimony and exhibits * * *' The district court's opinion was filed July 10, 1964, about two years before the change in the rule. In reviewing the record on this point, we were satisfied that the trial court's description of the state of the evidence was correct and that the plaintiff-appellee had failed in its burden of proof. We reach no different conclusion if we apply the new Rule 44.1. Since Esso is the plaintiff, it still has the task of persuasion that it has a good cause of action and it has failed to do that. In its petition for rehearing, Esso cites the Guatemalan Supreme Court's decision in DeBarillas et al. v. Compania Distribudor Guatemalteca Shell (1954), as deciding both that the Accident Law imposed a regime of strict liability and that recovery was not limited to 'users' of transportation services. But the Court made it quite clear that its decision was based not on its construction of the provisions of the Accidents' Law which are involved in this case,[4] but on another section in which recovery is based upon fault.[5] Moreover, in Beteta v. Bressini (1955), the Supreme Court narrowly construed the relevant provisions of the Accident Law in holding that the owner of a private automobile was not the 'owner of any means of transportation, by land, water, or air' and refused to allow recovery without a showing of fault. Consequently, we are not persuaded that the Court would not have similarly construed the statute narrowly in this case, and would have denied Esso's claim, in the light of the preambles to the 1945 amendment,[6] on the grount that recovery was restricted to users of transportation services.
 
 
 27
 The second ground alleged by the petitioner is that this court 'in effect, tried the case de novo and substituted its views of the relative risks which it used as a basis for reversal * * *' of the trial court's conclusion that it was negligent of Captain Dahle not to have left the terminal at 2130. However, we simply pointed out that the trial court should judge the conduct of the master of a vessel in the light of the circumstances which he faced at that time (to use petitioner's example, at 2130, September 16, 1955) and not as they may have appeared to one looking back at them several hours or several days later. It was then incumbent upon the trial court to decide whether, under those circumstances, a reasonably prudent master of a vessel like the Gasbras Sul would have considered the risk of departure from the terminal as excessive. As this was not done by the trial court, it committed an error of law. With regard to appellee's assertion that this court arbitrarily changed the trial court's finding concerning the precise nature of the warning given Captain Dahle by Captain Jensen, as well as its claims concerning other findings in the case, we conclude that, though there is some evidence to support the findings made, as the reviewing court, we are, on the entire evidence, left with the definite and firm conviction that a mistake was committed. Guzman v. Pichirilo, 369 U.S. 698, 702, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1961); United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); American President Lines, Ltd. v. Towboat Seneca, et al., 384 F.2d 511 (2 Cir., 1967).
 
 
 28
 The petition for rehearing is, therefore, denied.
 
 
 
 [1]
 It was recorded in the log as a mooring line but a later survey of the vessel's stern disclosed marks which indicated that it was a buoy
 
 
 [2]
 Opinion below in this case, 239 F.Supp. 212 (S.D.N.Y.1964)
 
 
 [3]
 The Guatemalan Accident Law referred to consists of Legislative Decree No. 1827 promulgated May 10, 1932 as amended and supplemented by congressional decrees Nos. 178 and 1051 promulgated October 31, 1945 and May 5, 1954, respectively
 
 
 [4]
 The Guatemalan Accident Law referred to in pertinent parts read as follows:
 'Article 1-- The railroad, steamship, tram, automobile, airplane companies and the owners of any means of transporation, by land, water, or air, shall be severally responsible in civil action, with the perpetrators or accomplices for the damages and losses that are caused by the persons entrusted with the vehicles even when the person that causes them is not an employee of said companies or enterprise, provided the person in charge of the vehicles had entrusted them to another even in a transitory manner. 'Article 3-- The responsibility referred to in Article 1 of this decree ceases when it is proved that the damaged party has given rise, intentionally, to the resulting damage, or loss, or when he acted in manifest violation of the regulations issued by the Executive Branch with respect to public services of transportation. Those obligated to the payment of the indemnification shall be the only ones called upon to prove this defense.'
 
 
 [5]
 The Court ruled:
 '* * * if the question in another field, that of the subjective theory, which is in fact the opinion of this Court, in the present case, the responsibility of the Company is clear anyway; because in application of Article 10 of the Accidents' Law, amended by the 5 of Congressional Decree 189, the light and power companies and others similar which may cause damages because of the bad conditions of their machines, lines or equipment.-- Without a shadow of a doubt, the companies which distribute products like gasoline appear to be regulated by this rule as those referred to as similar, because the handling of gasoline can give rise to grave accidents * * *'.
 
 
 [6]
 'WHEREAS:
 It is the duty of the State to provide for the safety of persons that make use of public services of transportation, by means of legal provisions that obligate the owners of such services and the persons entrusted with the management of the vehicles, to use the highest degree of care and attention in the performance of their duties;
 'WHEREAS:
 The present law that regulates indemnifications for causes of accidents or death happening to persons that make use of the public services of transportation is deficient, as it was issued in a time when the present problems were not contemplated in the same way; * * *'